**STATE of Missouri, Respondent,**

v.

**Donald Alan HAMILTON, Appellant.**

**Donald Alan HAMILTON, Appellant,**

v.

**STATE of Missouri, Respondent.**

Nos. 18530, 19431.

Missouri Court of Appeals, Southern District, Division Two.

Jan. 26, 1995.

Rosalyn Koch, Office of the State Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Traci J. Sanders, Asst. Atty. Gen., Jefferson City, for respondent.

CROW, Judge.

A jury found Appellant, Donald Alan Hamilton, guilty of four felonies and assessed punishment:

Count I: rape, § 566.030.3 [1]; fifteen years' imprisonment.

Count II: rape, § 566.030.3; fifteen years' imprisonment.

Count III: sodomy, § 566.060.3; ten years' imprisonment.

Count IV: sodomy, § 566.060.3; ten years' imprisonment.

The trial court imposed those sentences, ordering: (a) the sentences on Counts I and III to run concurrently; (b) the sentences on Counts II and IV to run concurrently; (c) the sentences on Counts I and III to run consecutively to the sentences on Counts II and IV.

Appellant brings appeal 18530 from that judgment.

Appellant commenced an action per Rule 29.15 [2] to vacate the conviction and sentences. The motion court, after an evidentiary hearing, entered an order denying relief.

---

1. References to statutes are to RSMo 1986.

2. Rule references are to Missouri Rules of Criminal Procedure (1993).

Appellant brings appeal 19431 from that order.

We consolidated the appeals, Rule 29.15(*l*), but address them separately in this opinion.

## Appeal 18530

Appellant does not challenge the sufficiency of the proof to support the verdicts; consequently, we need not set forth all the sordid details. However, resolution of the assignments of error requires an introduction to the quintet mired in this dolorous tale.

Regina.[3] Mother of the three girls identified next.

P__, to whom we henceforth refer as "the eldest girl." She was born March 1, 1973.

L__, to whom we henceforth refer as "the middle girl." She was born November 23, 1976.

B__, to whom we henceforth refer as "the youngest girl." She was born May 20, 1978.

Appellant, age thirty-five at time of trial, August 12–14, 1992.

The middle girl was the victim in Counts I and III. The youngest girl was the victim in Counts II and IV. All four crimes occurred between August 1, 1989, and October 1, 1989. At that time, the middle girl was twelve; the youngest girl was eleven.

Three of Appellant's four points relied on pertain to appeal 18530. Points I and II assert the trial court committed plain error in receiving testimony set forth *infra.* Point III complains about the prosecutor's argument to the jury.

Appellant got acquainted with Regina in Savannah, Georgia. The date they met, like sundry other details of the saga, cannot be determined from the record. Nonetheless, sufficient facts can be marshaled to provide an understanding of the issues.

In June, 1985, Appellant and Regina were living together in Savannah. The eldest girl resided with them. The middle girl and the youngest girl were with their father in Florida. Those two returned to Regina and Appellant in Savannah "at the beginning of the school year."

The eldest girl testified her first sexual encounter with Appellant was "oral sex" when she was thirteen in Savannah. We deduce this was in 1986. We gather from her testimony that similar episodes occurred intermittently thereafter until Regina, Appellant, and the three girls moved to Missouri in 1987. Upon arrival, they took up residence in the home of Regina's mother, Helen.

Helen testified her residence at time of trial was Galena, Missouri. Whether that was her address in 1987 when the quintet moved in is unclear. Appellant recalled Helen lived in Branson at that time.

Be that as it may, the significant fact regarding Helen's household is that it included her son, J__, then age nineteen or twenty. He was Regina's brother, thus the uncle of her three daughters.

Appellant testified that after a month or two at Helen's residence, he, Regina, the middle girl and the youngest girl moved to Kirbyville. Regina recalled moving from Helen's residence with Appellant, the middle girl and the youngest girl, but testified they moved to Branson. The eldest girl did not accompany them; she remained with Helen.

The eldest girl testified that while at Helen's, she was raped by J__. On cross-examination by Appellant's lawyer, the eldest girl identified entries written by her in a diary indicating her liaison with J__ was consensual. The eldest girl also identified entries recounting sexual intercourse with two other males within a few weeks.

Helen, presented as a witness by Appellant, testified that during the time the eldest girl resided with her, she (Helen) had "problems" with the eldest girl lying. Helen declared, "I didn't believe nothing that she said, because it was just one lie right after another." According to Helen, the eldest girl made "sexual advances" to J__ and never complained that he raped her. Helen added that the eldest girl had "a lot of influence" over the middle girl and the youngest girl.

J__'s intercourse with the eldest girl impregnated her. The eldest girl then moved in with Appellant, Regina, the middle girl

---

**3.** To ensure anonymity of Regina's children, we refer to Regina by only her first name.

and the youngest girl. The pregnancy was thereafter terminated by abortion.

The eldest girl testified that after the abortion, Appellant began having sexual intercourse with her. This escalated to the point that Appellant began sleeping with her instead of Regina. Appellant told the eldest girl he wanted to marry her, and they applied for a marriage license.

Carol Halbmaier, a social service worker with the Division of Family Services ("DFS") in Taney County, interviewed the eldest girl September 27, 1989, at school. The interview resulted from a "hot line report" that the eldest girl was being forced to marry Appellant.

The eldest girl revealed to Halbmaier that she and Appellant had been having sexual intercourse, but maintained she did not want to marry him.

Halbmaier also interviewed Regina, who confirmed that Appellant and the eldest girl slept together. Regina told Halbmaier that Appellant and the eldest girl had been having sexual intercourse "for approximately a year."

Halbmaier also interviewed Appellant. Halbmaier quoted him as saying he and the eldest girl were in love and had been having sexual intercourse about a year.

Upon authorization by the "Juvenile Court," DFS removed the eldest girl, the middle girl and the youngest girl from the residence on September 29, 1989, and placed them in foster care. Although the authorities had no evidence that Appellant had sexually abused the middle girl or the youngest girl, the court believed they were "at risk."

About October 10, 1989, Appellant and Regina left Missouri and went to Georgia because they feared they would be jailed.

Halbmaier interviewed the middle girl twice and the youngest girl once after they were in foster care. Neither mentioned any sexual abuse by Appellant.

On November 14, 1989, Laura Hayward, a DFS children service worker, interviewed the middle girl and the youngest girl, separately. The middle girl, using "anatomical dolls," revealed instances of fellatio and sexual intercourse with Appellant. The youngest girl informed Hayward that Appellant had engaged in sexual intercourse with her.

Hayward testified it is not unusual for children who have been sexually molested to initially deny it and later disclose it.

As a result of Hayward's discoveries, DFS had the middle girl and the youngest girl examined by Dr. John Ferguson, an obstetrician and gynecologist, on December 7, 1989. Ferguson obtained a "history" from each girl before examining her.

At trial, Ferguson testified the middle girl told him that her mother's boy friend began having sexual intercourse with her about a year and a half before the examination. Ferguson's testimony about the examination included this:

" [T]here were multiple old lacerations of the hymen. The vagina admitted two fingers, which is a normal exam for a woman who has had intercourse or has had some object the size of a penis put into the vagina.

Q  Were your findings consistent with the history?

A  Yes, sir.

Q  Did you believe her?

[Appellant's lawyer]: Objection. He's asking for an opinion this witness is not qualified to give.

[Prosecutor]: Your Honor, I'm sorry. May I respond? Doctor Ferguson's been asked that question at least a hundred times in Greene County. He's an expert, and I think he's entitled to.

[Appellant's lawyer]: I withdraw the objection to the answer. Withdraw the objection. Let him answer.

THE COURT: Go ahead.

Q  (By [Prosecutor]): Did you believe her, sir?

A  As far as I could tell, the girl was telling the truth."

The last-quoted answer is one of the matters about which Appellant complains in his first point, discussed *infra*.

Ferguson recounted that the youngest girl told him that her mother's boy friend had

forced her to perform "oral sex" on him, had kissed her on her "bottom," and had engaged in sexual intercourse with her "anywhere from several months to a year or two." She, like the middle girl, denied anyone else had ever touched her.

Ferguson's physical findings regarding the youngest girl were essentially identical to those regarding the middle girl. His testimony:

"Q Were your findings consistent with the history she gave you?

A Yes, sir.

Q Did you believe her?

A In my opinion, yes."

The last-quoted answer is also complained about by Appellant in his first point.

The middle girl testified that between August 1, 1989, and October 1, 1989, Appellant performed cunnilingus on her, had her perform fellatio on him, and engaged in sexual intercourse with her. She recounted he began making "sexual demands" of her in 1987. She initially refused, but Appellant eventually forced her to submit. She avowed she had not engaged in sexual relations with, or been sexually abused by, anyone prior to Appellant.

The youngest girl testified Appellant first made "sexual advances" toward her when she was nine. Prior to her removal from the home, Appellant frequently performed cunnilingus on her, forced her to perform fellatio on him, and engaged in sexual intercourse with her. The youngest girl avowed she had not had sexual relations with anyone before Appellant. She stated Regina told her that she (the girl) had been "sexually molested" at age two or three, but she did not remember any such incident.

Appellant testified he had no sexual contact with any of the three girls while they lived in Savannah. He avowed that after the eldest girl's abortion, she, for the first time, began manifesting affection for him. By then, said Appellant, he and Regina no longer had an intimate relationship.

Appellant recounted that he and the eldest girl told Regina they had fallen in love and would like to be together. According to Appellant, Regina said it would be "okay." Only then, said Appellant, did he begin sexual intercourse with the eldest girl.

As the relationship progressed, Appellant and the eldest girl began discussing marriage, and eventually applied for a marriage license. Appellant explained that he made a down payment on a "trailer" at Lampe for them to occupy by themselves, but when the eldest girl learned she would have to change schools if she moved there, she became upset and "started acting funny about the marriage."

Appellant swore he never had any sexual contact with the middle girl or the youngest girl. He speculated they accused him because he was the sole disciplinarian in the home and they resented it, as he was not their father. Appellant told the jury, "[T]hey hated me." Appellant also theorized that the middle girl and the youngest girl accused him because he and Regina departed Missouri, leaving the girls in DFS custody.

The transcript demonstrates Appellant's lawyer pursued a strategy designed to: (a) convince the jury Appellant was telling the truth in maintaining innocence of any sexual crimes against the middle girl and the youngest girl, (b) attribute the vaginal conditions found by Dr. Ferguson upon examining the middle girl and the youngest girl to the acts of others, not Appellant, (c) persuade the jury that the eldest girl, by her influence over her sisters, orchestrated their accusations against Appellant because she had tired of him, and (d) minimize adverse juror reaction to Appellant's sexual relationship with the eldest girl by establishing that he was not the one who deflowered her and that the relationship began only after (1) her liaisons with her uncle and two other males, (2) her abortion, and (3) her amorous advances toward him, culminating in marriage plans.

In implementing that strategy, Appellant's lawyer, in addition to the evidence already noted, presented evidence that the middle girl told a DFS worker Appellant did not have sex with her, but a friend of her father did when she was three or four, and that the youngest girl, while in foster care, wrote a letter to one Jon F__ on which she drew a

penis and penned the message: "I love you. .... I liked when you got farther up."

Appellant's lawyer called Regina as a defense witness. She testified that after the middle girl and the youngest girl returned from visiting their father in 1985, they reported sexual activity with one Bobby G__. Regina further testified she observed no inappropriate activity between Appellant and any of the girls in Savannah, and that none of the girls told her about any such activity. Regina added that after the move to Missouri, neither the middle girl nor the youngest girl reported any sexual advances by Appellant, and that if they had done so, she would have had him arrested. Regina did not have Appellant arrested for his relationship with the eldest girl because, according to Regina, the eldest girl told Regina she was in love with Appellant and wanted to marry him.

The record is replete with other testimony, adduced from various witnesses by Appellant's lawyer, designed to establish that neither the middle girl nor the youngest girl complained about Appellant to anyone until their statements to DFS worker Hayward on November 14, 1989, and that those accusations were motivated by resentment of Appellant as disciplinarian and by anger at his leaving Missouri with Regina, consigning the children to DFS.

The trial strategy of Appellant's lawyer was revealed in his opening statement to the jury. He presented the theme that Regina had no control over the girls, and that the middle girl and the youngest girl resented the discipline imposed by Appellant. Counsel forecast there would be evidence that the vaginal penetration discovered by Dr. Ferguson resulted from molestation by a man in Florida before Appellant and Regina began cohabiting. Counsel told the jurors that after the eldest girl's abortion, she and Appellant fell in love and informed Regina, who approved the relationship. Then, said counsel, Appellant began sleeping with the eldest girl. Counsel added that the eldest girl, after applying for the marriage license,

backed out because she acquired a boy friend at school and did not want to change schools.

■ With that preface, we address Appellant's second point, which reads:

"The trial court plainly erred in admitting into evidence the testimony of [the eldest girl] describing a sexual relationship with Appellant because the evidence was irrelevant and inadmissible evidence of uncharged misconduct, in violation of Appellant's rights to due process and a fair trial ... in that the evidence did not prove or disprove any matter and issue as it was not probative on the issue of identity, mistake or accident, or a common scheme or plan and merely served to prejudice the jury against Appellant."

Citing *State v. Bernard*, 849 S.W.2d 10 (Mo. banc 1993), Appellant[4] maintains the testimony about his sexual activity with the eldest girl "was inadmissible evidence of other bad acts."

In considering Appellant's second point, we assume, arguendo, that had *Bernard* been decided before Appellant's trial, the evidence regarding his sexual activity with the eldest girl would, upon proper objection, would have been excluded. However, as noted earlier, Appellant was tried August 12–14, 1992. *Bernard* was decided February 23, 1993. When Appellant was tried, such evidence was arguably admissible per *State v. Lachterman*, 812 S.W.2d 759 (Mo.App.E.D.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1666, 118 L.Ed.2d 387 (1992), and the cases discussed there. Consequently, Appellant's citation of *Bernard* is mildly disingenuous.

In a pretrial conference, the prosecutor cited *Lachterman* to the trial court. Appellant's lawyer, evidently resigned to the inevitability of confronting the eldest girl's testimony about Appellant's sexual activity with her, conceived the tactics described earlier.

When the prosecutor presented the eldest girl as a witness, Appellant's lawyer did not object to her narrative about Appellant's sexual activity with her. Instead, Appellant's lawyer adduced testimony from her that she

4. The lawyer representing Appellant in these appeals is not the lawyer who represented him at trial.

was molested by one Glen G— at age six in Florida, that she wrote in her diary, "I'm in love with Donnie," and that she had no knowledge, as of September 27, 1989, that Appellant had any sexual relationship with either of her sisters.

With the record in this posture, we find no merit in Appellant's second point. His lawyer's strategy was to acknowledge Appellant's relationship with the eldest girl, deny the accusations regarding the middle girl and the youngest girl, and convince the jury that Appellant's candor about the eldest girl lent credibility to his declaration of innocence regarding her sisters. Cross-examination of the eldest girl by Appellant's lawyer produced this exchange:

"Q  You're aware that my client's been charged with a, alleging that he had sexual intercourse with you prior to the age of 17, isn't that true?

A  Yes.

Q  And you understand that he has confessed to that, isn't that true?

A  Yes.

Q  You understand that he will be charged with that and will be arrested eventually on that, isn't that true?

A  Yes.

Q  And you understand that he's never denied the allegations of that charge, isn't that true?

A  Yes.

Q  But that he's denying the other allegations, isn't that true?

A  I guess...."

In enforcing the rules of evidence, a trial judge does not act in isolation. The judge deals with evidence as the litigants present it, ruling on admissibility issues raised by objection as testimony and exhibits are offered. While there could be an occasion where evidence is so blatantly inadmissible and so glaringly prejudicial that a trial judge should exclude it even though no one objects, the evidence complained of by Appellant in

his second point did not, *at the time he was tried,* fall within that category.[5]

■ The trial court was obviously aware of the strategy devised by Appellant's lawyer regarding the eldest girl's testimony. Appellant should not now be permitted, after an adverse result, to obtain reversal by claiming plain error. As observed in *State v. Martin,* 852 S.W.2d 844, 851[5] (Mo.App.W.D.1992), an accused's trial strategy that includes intentionally not objecting to allegedly inadmissible evidence cannot be a basis to invoke the plain error rule for appellate review of evidence the accused sought to use to his advantage at trial. Appellant's second point is denied.

■ His first point reads:

"The trial court plainly erred in allowing Dr. John Ferguson to testify that he believed the allegations made by [the middle girl] and [the youngest girl] because the testimony was inadmissible in that expert testimony commenting directly on a particular witness' credibility cannot be admitted at trial; such testimony resulted in a miscarriage of justice as the doctor's statements created a danger that the jury relied on the doctor's credibility assessments and usurped the jury's role in determining credibility, in violation of Appellant's rights to due process and a fundamentally fair trial...."

Appellant relies primarily on *State v. Williams,* 858 S.W.2d 796 (Mo.App.E.D. 1993). There, the accused was convicted of sodomizing a seven-year-old child. A doctor with expertise about child sexual abuse testified without objection that sexually abused children rarely lie about it, and that incidents of lying were less than three percent. The Eastern District of this Court, after a comprehensive review of pertinent case law, held the admission of the doctor's testimony was plain error, requiring reversal. The opinion explained:

"Expert testimony that comments directly on a particular witness' credibility,

---

**5.** Under new § 566.025, which took effect January 1, 1995, evidence of Appellant's sexual activity with the eldest girl when she was under fourteen years of age would appear to be admissible if he were tried now. *See:* S.B. No. 693, Vernon's Missouri Legislative Service 1994, No. 6, p. 1361.

as well as expert testimony that expresses an opinion with respect to the credibility or truthfulness of witnesses of the same type under consideration invests 'scientific cachet' on the central issue of credibility and should not be admitted.

... Vouching too much for the victim's credibility, [the doctor's] statements supplied improper verisimilitude on the issue of whether the appellant was guilty. In addition, the testimony included improper quantification of the probability of the complaining witness' credibility."

*Id.* at 800, 801 (citation omitted).

*Williams*, while reversing the conviction, acknowledged that a determination of whether plain error exists must be based on consideration of the facts and circumstances of each case. *Id.* at 798[4].

The circumstances here differ from those in *Williams*. Dr. Ferguson expressed no opinion on whether sexually abused children are generally truthful. He recounted the histories obtained from the middle girl and the youngest girl, described what he found upon examining them, and expressed his opinion that the results of his examination were consistent with the histories. Appellant cites no case demonstrating any of that testimony warrants reversal for plain error.

Only two answers by Dr. Ferguson arguably compel reversal for plain error. The first was in response to the prosecutor's question as to whether Ferguson believed the middle girl. The answer was, "As far as I could tell, the girl was telling the truth." The second was in response to the prosecutor's question as to whether Ferguson believed the youngest girl. The answer was, "In my opinion, yes."

As we have seen, Appellant's lawyer objected to the first question, but withdrew the objection. Only after the objection was withdrawn did Ferguson answer. As explained *infra* in our discussion of Appellant's fourth point, his lawyer withdrew the objection for a strategic reason and voiced no objection to the other question for the same reason.

We find no case, and Appellant cites none, where an appellate court convicted a trial court of plain error in failing to exclude evidence after an accused withdrew his objection to it. Reversal for plain error in such circumstances would enable an accused to create a dilemma for a trial court, rendering the court vulnerable to reversal regardless of which way it ruled.

If the trial court received the evidence, the accused could, as Appellant has done here, claim receipt of the evidence was plain error, requiring reversal. If the trial court excluded the evidence, the accused could contend on appeal that the trial court improperly interfered by barring evidence which the accused consciously chose to allow the jury to hear, thereby requiring reversal. To state the scenario is to expose its potential for mischief.

Furthermore, unlike *Williams*, Dr. Ferguson's testimony, in toto, was not an unconditional endorsement of the credibility of the middle girl and the youngest girl. Ferguson's cross-examination by Appellant's lawyer produced this dialogue:

"Q If you were aware that ... both girls had had prior sexual experience, and if you were aware that both girls had had vaginal penetration earlier in their life, and if the girls then told you that they'd had ... no prior sexual experience, would you testify today to the jury that you believed them?

A It would certainly put a bit of doubt in one's mind as to their ability to tell the truth very likely.

. . . . .

Q So, the testimony that you have today is that you can tell the jury that at some point in those children's lives they were penetrated?

A At sometime, that's correct.

Q Now some point in their lives, they were penetrated at an age that would increase the vagina to two fingers?

A Yes, sir.

Q And is there anything that you can tell this jury today that, scientifically or medically, would indicate to the jury that my client was the only person who ever was or was, in fact, the

person who has penetrated those children?

A No, you could not tell.

Q So your medical examination is simply—the bottom line is I can tell the jury that at some point in these girls' lives they were penetrated?

A That's correct."

It is evident that Dr. Ferguson did not undertake to convince the jury that he had the expertise to determine whether the middle girl and the youngest girl were truthful in naming Appellant as the cause of their vaginal dilation. Consequently, Appellant's first point is not controlled by *Williams.*

■ We acknowledge the prosecutor, in asking the two questions attacked by Appellant's first point, exhibited ignorance of, or disdain for, the rule that expert opinion testimony is not admissible as it relates to credibility of witnesses. *State v. Taylor,* 663 S.W.2d 235, 239[7] (Mo. banc 1984). However, Appellant's first point is before us for only plain error review. Under that standard, the alleged error must impact so substantially upon the rights of the accused that manifest injustice or a miscarriage of justice will result if left uncorrected. *State v. Driscoll,* 711 S.W.2d 512, 515[1] (Mo. banc 1986), *cert. denied,* 479 U.S. 922, 107 S.Ct. 329, 93 L.Ed.2d 301 (1986).

For the reasons set forth above, we hold there was no manifest injustice or miscarriage of justice in the jury hearing the testimony complained of in Appellant's first point. Accordingly, the point is denied.

■ Appellant's third point charges the trial court with plain error in "permitting" the prosecutor, during final argument, to make remarks which, according to Appellant, were improper. Appellant concedes there was no objection at trial, hence relief is available, if at all, only for plain error.

The law governing plain error review of a prosecutor's jury argument is succinctly set forth *State v. Bogard,* 836 S.W.2d 87, 89 (Mo.App.S.D.1992):

"Appellate courts of this state 'rarely grant relief on assertions of plain error as to closing argument ... because, in the absence of objection and request for relief, the trial court's options are narrowed to uninvited interference with summation and a corresponding increase of error by such intervention.' *State v. Clemmons,* 753 S.W.2d 901, 907–08 (Mo. banc [1988]), *cert. denied,* 488 U.S. 948, 109 S.Ct. 380, 102 L.Ed.2d 369 (1988). Because trial strategy looms as an important consideration in any trial, assertions of plain error concerning matters contained in closing argument are generally denied without explication. *State v. Amrine,* 741 S.W.2d 665, 669[1] (Mo. banc 1987) [*cert. denied,* 486 U.S. 1017, 108 S.Ct. 1756, 100 L.Ed.2d 218 (1988) ]; *State v. Wood,* 719 S.W.2d 756, 759[5] (Mo. banc 1986)."

We shall not extend this already prolix opinion by setting forth the prosecutor's comments and the issues to which they were directed. It is sufficient to report this was a robust trial, no quarter asked or given. We have, *ex gratia,* scrutinized the prosecutor's argument, in context, and find no manifest injustice or miscarriage of justice. No jurisprudential purpose would be served by further discussion of the third point. It is denied.

Judgment affirmed.

### Appeal 19431

■ Appellant's fourth point, the only one pertinent to this appeal, asserts the motion court erred in denying postconviction relief in that Appellant received ineffective assistance of counsel at trial. The point maintains Appellant's lawyer ("defense counsel") was remiss in failing to object to (1) the questioning of Dr. Ferguson as to whether he believed the accounts of the middle girl and the youngest girl, and (2) the evidence regarding Appellant's "alleged criminal conduct" against the eldest girl and the reading of statutes "criminalizing such conduct."

Excerpts from the trial transcript pertinent to complaint "(1)" appeared earlier in our narrative of the evidence in appeal 18530. Defense counsel, called as a witness by Appellant at the evidentiary hearing in the motion court, testified he (counsel) felt Dr. Ferguson's testimony that he believed the mid-

dle girl and the youngest girl was inadmissible. Asked why he withdrew the objection he made when the prosecutor asked Ferguson whether he believed the middle girl, defense counsel explained:

" [Dr. Ferguson] was the first witness . . . I had very carefully selected the jury to be most responsive to the argument that I intended to present to the jury. I got a very negative reaction from the jury when I voiced my objection. I also thought in my trial strategy and in my game plan for the trial that the evidence was such that the jury would not place a great deal of value on what the doctor had said.

So, I made a decision at that time to withdraw the objection so as to not alienate the jury right off the bat, thinking at the time that my strategy for later on in the trial would make up for any damage that was done by his testimony.

.      .      .      .      .

Q  What exactly did the jury do that caused you to withdraw the objection?

A  Very aggressive looks of anger, looks of suspicion. Keep in mind, in the first stages of any rape or sodomy trial that I've observed or experienced, you have a burden that you've got—or a hurdle that you've got to penetrate; and that's the type of crime that it is. And you've got to ensure that you get the jury with an open mind as opposed to making up their mind before the trial even starts. You know, keep in mind they had a 12–year–old victim and a 10–year–old victim, if I remember correctly. It's not an easy case to try. . . . I withdrew my objection because I felt like that the objection was doing more damage than his response would do.

.      .      .      .      .

Q  Why do you think [the jurors] wanted to hear his opinion?

A  Well, it was the—If I recall correctly, he was the first witness. We had an outstanding jury. They were very alert, very observant; and I just feel like, at that particular time, that they wanted to

hear the answer to that question. And my thinking was that I could repair the damage later. So, again, it was just a matter of my strategy on how to conduct the trial."

The motion court addressed the issue in its findings:

"[Defense counsel] deliberately chose to withdraw his objection and allow the evidence as a matter of trial strategy. The issue is whether this strategy was reasonable or whether the strategy was so deficient as to overcome the presumption of competent representation. [Defense counsel] testified that his strategy was to discredit the testimony of the victims by showing that they were skillful liars bent on framing [Appellant]. When Dr. Ferguson took the stand, [defense counsel] knew to cross-examine him regarding previous molestations of the girls by another man before they knew [Appellant]. . . . Then when he testified that he believed the girls, [defense counsel] came back with an effective cross-examination in which he confronted the doctor with the prior molestations and the possibility that the girls had successfully deceived him. This fit in well with the general strategy of proving the girls to be skillful deceivers of well-meaning adults. In the whole context of the trial the decision not to object to the testimony appears reasonable. From the Court's observation of the trial and testimony of [defense counsel] the Court cannot find that counsel was ineffective and denied [Appellant] a fair trial."

■■■ Appellate review of the motion court's denial of postconviction relief is limited to a determination of whether the findings and conclusions of that court are clearly erroneous. Rule 29.15(j); *State v. Ervin*, 835 S.W.2d 905, 928 (Mo. banc 1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993). Such findings and conclusions are clearly erroneous only if, after a review of the entire record, the appellate court is left with the definite and firm impression that a mistake has been made. *Id.*, 835 S.W.2d at 928.

■ Counsel is afforded broad latitude as to questions of trial strategy. *State v. Davis*, 814 S.W.2d 593, 603 (Mo. banc 1991), *cert. denied*, 502 U.S. 1047, 112 S.Ct. 911, 116 L.Ed.2d 812 (1992). A court will not find ineffective assistance where the conduct complained of by the accused involves counsel's use of reasonable discretion in a matter of trial strategy. *State v. White*, 798 S.W.2d 694, 698[9] (Mo. banc 1990). It is only the exceptional case where a court will hold a strategic choice unsound. *State v. Heslop*, 842 S.W.2d 72, 77 (Mo. banc 1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 2369–70, 124 L.Ed.2d 275 (1993).

In his brief, Appellant maintains that when the prosecutor asked Dr. Ferguson whether he believed the middle girl, defense counsel should have objected outside the hearing of the jury, thereby avoiding negative jury reaction. However, that ignores the dynamics of the incident.

It was only after the objection and the prosecutor's rejoinder that defense counsel sensed odium in the jury box. Had he then pursued the issue at sidebar and prevailed, the jurors would likely have deduced it was defense counsel who silenced Dr. Ferguson.

*State v. McCarter*, 883 S.W.2d 75 (Mo.App. S.D.1994), cited by Appellant, does not compel reversal. There, the accused was charged with sexual abuse. His lawyer, after using the report of a DFS worker to impeach her, presented the report in evidence. The report included information that several years earlier, three of the accused's grandchildren reported sexual abuse by him, but no charges were filed. Following conviction, the accused sought postconviction relief, claiming his lawyer rendered ineffective assistance in placing the report in evidence. The motion court agreed and vacated the conviction. This Court affirmed, finding the motion court's ruling not clearly erroneous.

There is a significant difference between *McCarter* and the instant case. In *McCarter*, the motion court found the accused's lawyer rendered ineffective assistance and *granted* postconviction relief. This Court's task was to decide whether the motion court was clearly erroneous.

In the instant case, the motion court found no ineffective assistance and *denied* postconviction relief. Again, our role is to decide whether the motion court was clearly erroneous.

In *McCarter*, the motion court found there was no indication that the prosecutor intended to call the accused's grandchildren as witnesses, and the report would not have been received in evidence had the prosecutor offered it. The motion court concluded that presentation of the report by the accused's lawyer did not fall within an acceptable range of professionally competent assistance and constituted a failure to exercise the degree of skill and diligence that a reasonably competent lawyer would have exercised under similar circumstances. *Id.* at 79. This Court held that finding not clearly erroneous. *Id.*

In the instant case the judge who conducted the postconviction proceeding was the judge who presided over the jury trial. As we have seen, the judge carefully considered defense counsel's trial strategy and the tactics by which defense counsel carried it out, and found no ineffective assistance.

Given the latitude allowed counsel in making strategic choices, and mindful that an accused cannot succeed on a postconviction claim of ineffective assistance of counsel unless he demonstrates there is a reasonable probability that without counsel's errors the result of the trial would have been different, *State v. Stepter*, 794 S.W.2d 649, 656 (Mo. banc 1990), we cannot, under the "clearly erroneous" standard of review, convict the motion court of error in rejecting complaint "(1)" of Appellant's fourth point.

■ As to complaint "(2)" of the fourth point, the motion court found that at the time Appellant was tried, the law regarding admissibility of other crimes to prove guilt of the crime charged was unsettled, that it was arguable that the sexual acts committed by Appellant with the three girls demonstrated a scheme to live with their mother and have captive and defenseless subjects for his pleasure, that defense counsel did not object to the eldest girl's testimony about Appellant's sexual activity with her because counsel did not want the jurors to sense he was conceal-

ing evidence, and that counsel confronted the eldest girl's testimony by "thorough cross-examination in which he made use of her diary, her considerable sexual experience, and a possible motive for testifying against [Appellant]."

The motion court found those tactics fit into the overall strategy which was reasonable, though unsuccessful. Consistent with those findings, the motion court concluded defense counsel did not render ineffective assistance in failing to object to the eldest girl's testimony about Appellant's sexual activity with her.

Courts reviewing claims of ineffective assistance should refrain from hindsight in assessing counsel's conduct at trial. *State v. Wickizer,* 859 S.W.2d 873, 883[19] (Mo.App.W.D.1993); *State v. Lewis,* 785 S.W.2d 656, 660 (Mo.App.W.D.1990). A decision regarding trial strategy is not to be judged ineffective constitutionally merely because in retrospect it may seem an error in judgment. *Davis,* 814 S.W.2d at 603[8].

Applying those principles, we hold the motion court's finding that defense counsel did not render ineffective assistance regarding the eldest girl's testimony about Appellant's sexual conduct with her is not clearly erroneous.

Appellant's complaint about defense counsel's failure to object when the prosecutor read statutes "criminalizing such conduct" is based on an incident during the eldest girl's testimony. The prosecutor read aloud § 566.050 defining sexual assault in the second degree (sexual intercourse by a person seventeen years of age or older with a person to whom he is not married who is sixteen), and § 566.070 defining deviate sexual assault in the first degree (deviate sexual intercourse with a person to whom the perpetrator is not married and who is incapacitated or fourteen or fifteen years old).

*State v. Watson,* 672 S.W.2d 701, 703[3] (Mo.App.E.D.1984), held the trial court erred in permitting the prosecutor to read the jury a statute whereby he created the impression that the State no longer carried the burden of proving guilt, but instead the accused bore the burden of proving innocence. Here, however, Appellant makes no contention that the statutes misled the jury.

More importantly, however, the strategy devised by defense counsel to convince the jury that Appellant had committed no crime against the middle girl or the youngest girl was to point out that he had admitted sexual activity with the eldest girl. The theory was that if Appellant was a person who would lie to escape trouble, he would have lied about his sexual involvement with the eldest girl. By presenting Appellant to the jury as an honest man willing to face the consequences of his sexual misdeeds with the eldest girl, defense counsel hoped the jury would accept Appellant's denials about her sisters. Because of that strategy, there was no reason for defense counsel to object to the prosecutor reading the statutes "criminalizing" Appellant's conduct with the eldest girl.

Appellant's fourth point is denied.

The order denying postconviction relief is affirmed.

PREWITT and PARRISH, JJ., concur.