STATE of Missouri, Plaintiff–
Respondent,

v.

Sammy COLLINS, Defendant–
Appellant.

No. 26535.

Missouri Court of Appeals,
Southern District.

May 31, 2005.

Nancy A. McKerrow, Columbia, MO, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Jefferson City, MO, and Ronald S. Ribaudo, for respondent.

KENNETH W. SHRUM, Judge.

A jury found Sammy Collins ("Defendant") guilty of child molestation in the first degree (§ 566.067).[1] He was sentenced to a term of twelve years' imprisonment. Defendant urges reversal under the plain error standard, claiming the trial judge committed reversible error when he did not *sua sponte* exclude certain expert testimony. We hold that admission of the questioned evidence does not mandate reversal, either under the plain error standard or otherwise. Accordingly, we affirm.

### FACTS

A.J.C. ("Victim") was born March 20, 1992, to Defendant and Carolyn Jean Collins. Along with Victim's brother (R.K.C.), the family resided together from 1995 to 2000. These children were removed from their parents' custody in September 2000 after the Division of Family Services ("DFS") found they were living in "filthy" and "deplorable" conditions.

By November 2000, Victim began telling authorities about sexual abuse inflicted on her while at her parents' home. Early on, Victim was reticent and cryptic in her disclosures about what had happened and who was responsible. Her initial reluctance to talk about the abuse, followed by her later detailed accounts thereof (which implicated several persons) is recounted more fully below.

At this point, suffice it to say that by December 2000, Defendant was suspected of being one of Victim's abusers. Because of that, he was asked to contact the Mountain View, Missouri, police department. Upon doing so, the interviewing officer first advised Defendant of his *Miranda* rights. Defendant then agreed to talk with the policeman about "the allegations ... against him by his daughter, referencing sexually abusing her."

The officer's at-trial testimony about the interview included the following:

"Q. [to officer] Did he initially just confess, or deny it in the beginning?

"A. He denied it at first.

"Q. [D]id he just say he didn't do it.

"A. Yes.

"Q. And what, if anything, did you say to him?

---

1. The case was tried on a change of venue from Howell County. "A person commits the crime of child molestation in the first degree if he or she subjects another person who is less than fourteen years of age to sexual contact." § 566.067.1. The phrase "sexual contact" means "any touching of another person with the genitals or any touching of the genitals or anus of another person, or the breast of a female person, for the purpose of arousing or gratifying sexual desire of any person." § 566.010(3). Statutory references are to RSMo (2000), unless otherwise stated.

"A. I said to him, you know, all these years I've been doing this, I've never known a child in his daughter's age group to lie about such an allegation. I pointed out to him, it's best to be truthful when you've made a mistake and own up to it, that he's, you would be putting a lot of people through a lot of grief if you did this and tried denying it. At that particular point, he admitted to having molested his daughter."

The officer then identified a written confession signed by Defendant. It read:

"During the summer of the year 2000 I touched my daughter's breast and vagina in a sexual manner. I think it was less than 5 times, but I'm not sure of the number of times. These incidents happened in the bedroom of my home. These incidents happened at different times of the day or night. The details of these incidents are unknown to me at this time."

Additional inculpatory testimony included this:

"Q. [to interviewing officer] [P]rior to filling out that statement and when [Defendant] started telling what he did, what was his demeanor?

A. He was what I would call repentative [sic], he was crying and upset about what he had done and he said, 'I'm obviously guilty and I'm sorry.'"

Victim's at trial testimony, *inter alia*, was that Defendant "touched her [in the vaginal area;]" that he used "[h]is penis[]" to touch her; that this happened "more than once;" that at times Defendant went around the house naked; that usually Defendant's penis was "pointing down" as he walked about naked, but was "pointing straight" when he used it to touch Victim. She further testified that the "touching" usually happened in Defendant's bed, Defendant was "on top of [her]," and he

[Defendant] "would stick his penis in my vagina."

During Victim's cross-examination, she denied Delbert Walker (an adult male baby-sitter) had ever "touched his private inside [her] private." She also denied ever being at Delbert's house and noticing "white stuff come out of [her] butt" when she went to the bathroom. Victim made these denials at trial, yet told counselors earlier that these things had occurred.

In a similar vein, during cross-examination, Victim denied having intercourse with her brother (R.K.C.), although in pre-trial interviews she said this had happened. Defense counsel's efforts on re-cross to press Victim about these contradictory statements took this form:

"Q. [to Victim by defense counsel] Do you recall if I asked you [in a pre-trial interview] about whether ... you had sex with your brother?

"A. Yes.

. . . .

"Q. What did you tell me?

"A. I told you that my dad made him ... do it with me.

"Q. Do it with you, you mean sexual intercourse with you?

"A. No.

. . . .

"Q. What do you mean?

"A. He made me suck his dick."

Other at-trial witnesses included child advocacy center employee Barbara Brown ("Brown"), Victim's therapist Dr. Melissa Hagen ("Hagen") (a psychologist), law enforcement personnel, and Leta Holh (a pediatric nurse who did a SAFE examination of Victim). Their testimony about interviews and examinations of Victim included the following. Walker (the baby-sitter) vaginally raped and anally sodomized Victim. As a result of Walker's

abuse, Victim was incontinent, i.e., "her anus was open, there was no skin folds there and there was just stool that was just seeping out constantly." Moreover, these witnesses told the jury about Victim's other claims of sexual abuse, i.e., allegations that Defendant abused her (including acts of sexual intercourse), R.K.C. (Victim's brother) abused her, and Victim's mother was involved. From her interviews with Victim, witness Brown concluded Victim's mother "was frequently aware of what was happening [and] often participated in what was happening, was in the same room and did some of the same types of things to her."

The issue on appeal involves certain testimony by witnesses Brown (the child advocacy interviewer) and Dr. Hagen (Victim's therapist). Specifically, Defendant claims there were five instances when the trial court should have interceded, *sua sponte*, and kept these witnesses from commenting on Victim's credibility. This testimony and other related matters follow.

Brown first interviewed Victim on January 18, 2001. At that interview, Victim "alluded to a lot of bits and pieces of information." Victim stated "that she had just gotten out of bed, was going ... between the bedroom and the bathroom ... and she didn't have any clothes on so [Defendant] put his hands [on] her titties and her private part to cover her up from the other person's view." During that interview, Victim said nothing about any type of penetration of her vagina.

Immediately after making this disclosure, Victim stated "she wasn't ready to talk about it [the touching]." At trial, the prosecutor asked Brown if this was "common," and Brown responded, "Oh yes, very." The prosecutor also asked, "And the common thing is the detraction?" Brown answered:

"Probably the most common thing we see is what we would call a syndrome called child abuse accommodation syndrome and the portion of that syndrome that I think [Victim] exhibited over and over again is the delayed unconvincing retracting disclosure. She would give little pieces of information through the process, she would give just a little bit, then she would back up, she would give a little more and then she would back up and that is not only common, we actually expect that of children."

Brown's "accommodation syndrome" testimony is part of what Defendant complains about on appeal.

On January 29, 2001, Brown conducted a second interview of Victim. At that point, Victim only implicated Defendant as follows: While swimming, Defendant "touched her private parts while they were in the water." Essentially, Brown's second interview of Victim "ended with not too much information than what we began with." In recounting this interview, however, Brown was asked whether there were times that she intentionally misstated facts during the interview, and Brown responded affirmatively. When asked about Victim's response to "misstated facts," Brown testified:

"No, she corrected me, which is one of the hallmarks of credibility for kids. In fact one of the things that we do in the beginning and this is research based is if you tell kids ... 'You know, if I forget something or if I get something wrong, it's your job to make sure I get it right' and on several times during the ... interviews she corrected me or if I misstated something she would give me the correct or appropriate information."

The "hallmark of credibility" comment by Brown is another part of Defendant's claim of trial court error.

As Brown further talked about her second interview of Victim, she (Brown) said Victim told two other people of the abuse. Victim told a friend at school who told her that she should not be talking about such things "so that kind of shut her down." Victim also told her brother that a friend of Defendant touched her, "but she said that she had really lied to [R.K.C.] because she didn't want [him] telling her friends or other people [due to her fear] they wouldn't be her friends." When asked if this type of behavior was common among kids, Brown testified, "Very, very common." This evidence is also part of what Defendant complains about on appeal.

On September 26, 2001, Brown interviewed Victim a third time. At that time, the only abuse disclosed by Victim was that committed by Walker.

Brown's fourth and final interview of Victim occurred April 15, 2002. Brown stated at trial that they discussed allegations regarding Victim's mother. Brown then told the jury:

> "[Victim] said, and this was after, again, lots and lots of minimizing and distancing, she said, and this is a quote, 'When my dad would sexually abuse me, Mom would rub her boobs in my face.' She also talked about Mom threatened her to keep quiet and that they would tie her up with a yellow rope, that they had a rope cut in four pieces and they kept it under the bed."

When asked to explain why the "yellow rope" comment was unique, Brown replied:

> "She had some really good detail of that, that's somewhat [sic] we call idiosyncratic detail, in other words kids of this age aren't smart enough to make up stuff or stories that [are] going to sound really credible, they don't know those are important pieces of information or evidence so we found that to be some credible idiosyncratic detail."

Brown's "idiosyncratic detail" comments are also part of what Defendant now complains about.

The final testimony at issue came from Dr. Melissa Hagen, Victim's psychologist, who conducted over 150 sessions with Victim. In discussing the abuse allegations, Hagen testified that the descriptions of abuse became increasingly more specific over time. Hagen characterized this behavioral tendency to provide more detail as time passed as "extremely typical" because:

> "discussing this type of issue is usually uncomfortable for most people, starting out with generalities and progressing to the more specifics tends to be what people will do to cope with something that is stressful, embarrassing, that they feel ashamed about, it's also a safety issue and the progression will occur whenever a person feels less likely that they're going to be harmed or hurt in some way if they make the disclosure."

Hagen's description of Victim's behavior as "extremely typical" is the fifth and final basis of Defendant's claim of trial court error.

At the trial's conclusion, the jury was instructed that it was its duty "alone [to] decide upon the believability of the witnesses and the weight and value of the evidence." Further, the jury was instructed that:

> "In determining the believability of a witness ... you may take into consideration the witness' manner while testifying; ... any interest, bias, or prejudice the witness may have; the reasonableness of the witness' testimony considered in the light of all of the evidence in the case; and any other matter that has a tendency in reason to prove or disprove the truthfulness of the testimony of the witness."

The jury convicted and this appeal followed.

## DISCUSSION AND DECISION

Defendant's only point on appeal urges reversal because the trial judge did not *sua sponte* preclude Brown and Hagen from testifying to what Defendant characterizes as "credibility assessments" of Victim. Defendant candidly admits that appellate review of his point is limited to the plain error standard because the testimony was admitted into evidence without objection or comment. The testimony at issue are those five instances pointed out extensively in the statement of facts.

■ Our review of Defendant's claims is governed by the following principles. First and foremost, "[t]rial courts have broad discretion in determining the admissibility of evidence." *State v. Churchill*, 98 S.W.3d 536, 538[1] (Mo.banc 2003). To constitute reversible error, a defendant must show prejudice, and reversal will only occur if the error was so prejudicial that it deprived the defendant of a fair trial. *Id.* at 538[2]. "When determining the admissibility of opinion testimony, expert witnesses should not be allowed to give their opinion as to the veracity of another witness's statement, because in so doing, they invade the province of the jury." *Id.* at 538–39[3].

■ To be admissible, the probative value of an expert's opinion testimony must outweigh its prejudicial effect. *State v. Taylor*, 663 S.W.2d 235, 240[8] (Mo.banc 1984). When a scientific expert testifies that a particular witness is telling the truth, prejudice often arises because the expert's testimony invests scientific cachet to an issue (credibility) that the jury is capable of determining without an expert's help. *Id.* at 240–41; *State v. Williams*, 858 S.W.2d 796, 798–800 (Mo.App.1993). Even so, credibility assessments of child abuse victims by expert witnesses in criminal cases do not always mandate reversal. *Churchill*, 98 S.W.3d at 539 n. 8.

## PRONG "A" OF POINT I: GENERAL PROFILE TESTIMONY

■ In considering Defendant's point relied on, we group three of the testimonial excerpts about which Defendant complains together as "Prong A." We do so because they have common characteristics that are dispositive of the alleged error. Specifically, we refer to (1) Brown's testimony that Victim exhibited behavior consistent with child sexual abuse accommodation syndrome, (2) Brown's testimony that Victim's behavior was "very, very common among victims of sexual abuse," and (3) Hagen's testimony that Victim's behavior was "extremely typical."

■ In criminal cases involving sexual abuse of children charges, there are two types of expert testimony that typically give rise to a challenge: general and particularized. *Churchill*, 98 S.W.3d at 539. "General testimony describes a 'generalization' of behaviors and other characteristics commonly found in those who have been the victims of sexual abuse." *Id.* at 539[4]. Frequently labeled "general 'profile' testimony," *Williams*, 858 S.W.2d at 798–99[11], trial courts are accorded great discretion in ruling such evidence admissible or non-admissible. *Id. See also State v. Silvey*, 894 S.W.2d 662, 671[8] (Mo.banc 1995) (holding no error in allowing social worker testimony that victim displayed behavioral indicators consistent with child sexual abuse); *State v. Matthews*, 37 S.W.3d 847, 850 (Mo.App.2001) (holding admissible expert testimony of two witnesses concerning characteristics and symptoms of victims of sexual abuse in general, and characteristics and symptoms seen in victim at issue).

In contrast, "[p]articularized testimony is that testimony concerning a specific victim's credibility as to whether they have been abused." *Churchill*, 98 S.W.3d at 539. In most instances, particularized testimony, i.e., that which explicitly or implicitly vouches for a victim's credibility is not admissible, whereas admission of general profile evidence is discretionary with the trial court. *Williams*, 858 S.W.2d at 799.

The "prong A" testimonial excerpts can be characterized as consistent with that reviewed in *Silvey* and *Matthews*. In none of the three instances did Brown or Hagen opine Victim suffered abuse at the hand of Defendant. Nor did their testimony directly or implicitly vouch for Victim's credibility, or the credibility of abuse victims in general. We find such testimony was no more than "profile" evidence of the kind approved in *Williams* and *Silvey*. Accordingly, we hold no error resulted, plain or otherwise, from the jury hearing such evidence. *State v. Tyra*, 153 S.W.3d 341, 348–49 (Mo.App.2005). This part of Defendant's point is denied.

### PRONG "B" OF POINT I: IDIOSYNCRATIC DETAIL TESTIMONY

In this part of his point, Defendant alleges that testimony elicited from Brown concerning her fourth interview with Victim also constituted plain error. To recount, Victim stated that her mother threatened to tie her up with a yellow rope that was under the bed if Victim told anyone of the abuse. Brown characterized this as "credible idiosyncratic detail," i.e., it was credible because children of this age normally do not possess the intelligence to "make up stuff or stories that [are] going to sound really credible."

As stated previously, Defendant did not object to this evidence. We are persuaded, however, that the absence of an objection was part of Defendant's overall trial strategy; consequently, we will not convict the trial court of error, plain or otherwise, for not *sua sponte* excluding this evidence. The reason for this is found in *State v. Hamilton*, 892 S.W.2d 774 (Mo.App.1995). There, in affirming convictions for rape and sodomy of children, this court said:

"If the trial court [*sua sponte* ] excluded the [expert's] evidence [claimed on appeal to be too much vouching for the victim's credibility], the accused could claim on appeal that the trial court improperly interfered by barring evidence which the accused consciously chose to allow the jury to hear, thereby requiring reversal. To state the scenario is to expose its potential for mischief."

*Id.* at 781.

In concluding that defense counsel wanted the jury to hear Brown's "idiosyncratic" testimony, we first note there was overwhelming physical evidence that Victim had been sexually abused. Consequently, it was important to the defense that it (1) show persons other than Defendant damaged Victim's vagina and anus by penetration, (2) convince the jury that Victim's statements implicating others as her abuser were credible, and (3) emphasize Brown's testimony about her first two interviews with Victim in which Victim said Defendant had touched her, but never said Defendant did so in a sexual way or that he penetrated her vagina or anus.

In keeping with this strategy, defense counsel (during trial) repeatedly characterized Defendant's "touchings" of Victim as "innocent." To bolster the "innocent touching" defense, Defendant needed the jury to believe Victim told the truth in her initial two interviews with Brown. Under the circumstances, Brown's "idiosyncratic detail" testimony supported Defendant's trial strategy. This follows because in her initial two interviews, Victim provided no

"idiosyncratic detail" about the touchings; the implication being that the touchings were not sexual abuse and nothing out of the ordinary occurred.

Our conclusion that Defendant consciously chose not to object to Brown's "idiosyncratic" detail comment is bolstered by the following. Throughout the trial, Defendant focused on Victim's account of abuse inflicted on her by Walker. In doing so, defense counsel hammered upon the fact that Victim gave explicit, detailed statements about the abuse Walker committed, but did not do so when talking about what Defendant did to her. This started in opening argument when, as defense counsel outlined anticipated evidence, he told the jury, *inter alia,* that Victim "would talk about after [Walker] would have sex with her she would poop and white stuff would come out of her butt." Counsel then told the jury, "That's about [Walker]. *You're not going to hear that same amount of detail regarding [Defendant].*" (Emphasis supplied.)

Having thus outlined to the jury the anticipated contrast between Victim's detailed account of Walker's abuse and her less detailed account of what Defendant did to her, defense counsel was then able to use Brown's "credible idiosyncratic detail" comments to support his defense strategy. For example, counsel asked Brown, "[Victim] also talked about [Walker] [putting] his private in her butt. By that we would call anal intercourse?" and she answered, "Correct." Then, counsel asked about Victim's statement regarding the "white stuff com[ing] out of her butt" and Brown responded that Victim did make that statement. Defense counsel then asked if this statement was "one of those idiosyncratic details that would go to support what she's saying," and Brown answered, "Yes."

The first purpose of this cross-examination was to show Victim was being truthful when she talked about Walker. This served to impeach that part of Victim's at-trial testimony denying Walker had sexual intercourse with her. It also bolstered the defense strategy of attacking Victim's credibility generally, and in particular, arguing that Victim's at-trial claim that Defendant "touched his penis" to her vagina was not credible.

A second reason why Defendant wanted the "idiosyncratic detail testimony" before the jury was to support the notion that Victim was truthful when describing sexual abuse *only* when she provided explicit details. The inference counsel wanted the jury to draw was that no sexual abuse occurred by Defendant because no details were provided, that is, Victim was truthful to the extent that the touchings were innocent. In keeping with this strategy, defense counsel's closing argument included this:

> "Let's talk about this story that you heard. The story starts out as [Defendant] touched me to cover me, then it's he touched me while we were swimming to now two years later it's Dad had sexual intercourse with me a lot, abused me a lot.
>
> "January of 2001, January 18th [Victim] meets [Brown], no, [Walker], no, [R.K.C.], [Walker] is the one she talks about with the most details, the white stuff coming out of her butt, that's the one that abused her, that's the one that shows the physical evidence."

Essentially, this was the only strategy that might reasonably work because the physical evidence of abuse was undeniable. Consequently, it was reasonable for counsel to focus on the abuse committed by others to attempt to show that the physical harm to Victim was caused by persons other than Defendant. This is especially

true when, as here, Victim's initial statements did not necessarily indicate criminal conduct by Defendant. Moreover, this strategy had even higher potential for success here since counsel could argue that Victim's trial testimony had been inconsistent with her prior statements.

Because Defendant used Brown's at-trial "idiosyncratic detail" comments to support his defense strategy, we will not convict the trial judge of error, plain or otherwise, for not *sua sponte* excluding such testimony. *See State v. Valentine*, 584 S.W.2d 92, 96–97 (Mo.banc 1979), *overruled on other grounds by Sours v. State*, 593 S.W.2d 208, 210 (Mo.banc 1980); *Hamilton*, 892 S.W.2d at 780–82; *State v. Darris*, 587 S.W.2d 89, 91 (Mo.App.1979). This prong of Defendant's point is denied.

### PRONG "C" OF POINT I: HALLMARK OF CREDIBILITY TESTIMONY

■ Witness Brown's "hallmark of credibility" comment was made in the following factual context. In explaining to the jury her interview techniques and how she interviewed Victim, Brown recounted her intentional misstatement of facts to see how Victim reacted. She told the jury Victim usually corrected her misstatements. Brown stated that this penchant for correction was "one of the hallmarks of credibility for kids." Under the circumstances, the comment does not mandate reversal.

First, the comment was not directed to Victim's trial testimony nor to her overall credibility as a witness. It was merely a comment as to Brown's ability to assess Victim's believability in the story related *to Brown*. Thus, the testimony was admissible. *Tyra*, 153 S.W.3d at 349; *State v. Cone*, 3 S.W.3d 833, 843 (Mo.App.1999).

Second, the testimony actually bolstered Defendant's trial strategy. In our discussion of Prong B, we recounted that strategy in detail. By allowing the jury to hear that Victim's initial stories may have been credible, Brown's testimony actually detracted from Victim's direct, at-trial testimony that implicated Defendant. For the same reasons stated in Prong B, Defendant's Prong C fails.

■ Finally, even assuming *arguendo* that the testimony was a comment on Victim's credibility, any error in its admission was harmless. *See Churchill*, 98 S.W.3d at 539 n. 8. Here, the evidence showed beyond any reasonable doubt that Victim had been sexually abused. Victim claimed Defendant was responsible for some of this abuse. Defendant, via his confession, corroborated Victim's claims. Other witnesses did the same. We are unsure what other evidence would be needed to make an overwhelming case of guilt. Further, the jury was specifically instructed that it was its duty *alone* to determine each witness's credibility. Significantly, the questioned comment was brief. Moreover, the comment was neither emphasized nor repeated by the prosecution. We hold, therefore, that any error in allowing the jury to hear this evidence was harmless error. This prong of Defendant's point is denied.

The judgment of conviction and sentence is affirmed.

PARRISH, P.J., concurs in result in separate opinion.

BARNEY, J., concurs.

JOHN E. PARRISH, Presiding Judge, concurring.

I concur in the result reached. I respectfully suggest that since the issues discussed in the principal opinion were not preserved for appellate review and are presented to this court as allegations of

624 ■

plain error, they do not warrant discussion other than that a review of the record with respect to the complaints appellant now makes discloses no manifest injustice or miscarriage of justice. *State v. Nunley,* 992 S.W.2d 892, 894–95 (Mo.App.1999). The evidence at trial strongly supports the guilty verdict rendered in the case. I concur in the decision to affirm.