**STATE of Missouri, Respondent,**

v.

**Joseph A. NASTASIO, Appellant.**

**No. WD 52320.**

Missouri Court of Appeals, Western District.

Nov. 18, 1997.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 23, 1997.

Application for Transfer Denied Jan. 27, 1998.

Susan L. Hogan, Appellate Defender, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Jefferson City, Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Before SMART, P.J., and LOWENSTEIN and LAURA DENVIR STITH, JJ.

LAURA DENVIR STITH, Judge.

Joseph Nastasio appeals his convictions for first degree murder, armed criminal action, and the unlawful use of a weapon. He claims that the trial court erred in allowing a witness to testify that the victim was afraid of him. He also contends that the trial court abused its discretion in overruling his objections to statements in the State's closing argument that he had been served with an *ex parte* order of protection at the time of the victim's death. Finally, Mr. Nastasio asserts that the trial court erred in allowing a police officer to testify that Mr. Nastasio requested an attorney, voluntarily made a statement to the police, and then terminated questioning by again requesting an attorney. Finding no reversible error, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The evidence, considered in the light most favorable to the verdict, shows as follows. Joseph Nastasio lived with Margot Highbarger in her home in Kansas City, Missouri, for approximately eight months. When the couple broke up in July 1994, Mr. Nastasio went to live with his daughter, JoMarie Nastasio, and her family. Shortly thereafter, Ms. Highbarger asked James Stith, an ex-boyfriend, to move back in with her. In the middle of July 1994, Mr. Nastasio went with his daughter to Ms. Highbarger's house to move some of his things. While they were there, Mr. Nastasio and Ms. Highbarger argued.

On the evening of July 21, 1994, Mr. Nastasio left his daughter's apartment with a gun and refused to tell her where he was going. At approximately 9:00 p.m. that evening, Mr. Stith was in Ms. Highbarger's neighbor's back yard when he saw Mr. Nastasio holding a shotgun and dragging Ms. Highbarger up the back steps of her home by her ponytail. Ms. Highbarger was yelling. Mr. Stith jumped the fence between the yards to help her. Mr. Nastasio told Mr. Stith to "stay out of it, it's none of your business. I'm going to kill the bitch." Mr. Stith then wrestled the gun away from Mr. Nastasio. In the course of the struggle, Mr. Nastasio fired the gun, but no one was hurt. Mr. Stith ultimately hit Mr. Nastasio in the head with a wooden shovel handle. When the police arrived, they took Mr. Nastasio into custody.

The next morning, Mr. Nastasio's daughter picked him up at the police station. She testified that for the rest of that day, he repeatedly threatened to kill Ms. Highbarger. Mr. Nastasio's daughter also testified that once or twice a week following the July 21, 1994, incident, she drove Mr. Nastasio by

Mobil–Teria, where Ms. Highbarger worked, and by Ms. Highbarger's home.

After the incident on July 21, 1994, Mr. Nastasio did not bring his gun home. He told his daughter, however, that he was going to purchase another gun. In early August 1994, David Buckley came to the apartment where Mr. Nastasio was living. The two men got into Mr. Nastasio's car, and Mr. Buckley sold Mr. Nastasio a .22 caliber Ruger Target II semi-automatic pistol. Mr. Buckley removed the ammunition from the gun, and Mr. Nastasio put the gun between the seats of his car.

On the evening of August 24, 1994, Mr. Nastasio and his daughter went to Motorsports in Raytown, Missouri. Mr. Nastasio test drove a blue Chevrolet Cavalier. He told the man at the car dealership that he wanted to have his mechanic look at the car and took the car to do so. He then kept the car overnight. At approximately 8:00 a.m. the next morning, on August 25, 1994, Mr. Nastasio's daughter and her family left to run errands. She saw Mr. Nastasio get in the Cavalier, but she did not see him leave. Mr. Nastasio was wearing dark blue pants and a dark blue shirt.

At approximately 8:15 or 8:30 a.m. on the morning of August 25, 1994, Janet Bradley, a co-worker of the victim, arrived at Mobil–Teria for work. While getting out of her car in the parking lot, she saw a light blue car drive in and noticed the man driving was wearing dark blue clothes and had black hair that could have been a wig. Ms. Bradley later identified the car as the light-blue Cavalier being test-driven by Mr. Nastasio. She also testified that Mr. Nastasio resembled the driver.

Sometime between the time Ms. Bradley arrived at work and 9:10 a.m., Ms. Highbarger arrived at work at Mobil–Teria. She was shot four times in the head at close range in the parking lot and died of extensive brain injuries and acute hemorrhaging. Police officers recovered four .22 caliber shell casings. Two of these shell casings had markings that matched live cartridges kept by Mr. Buckley and were consistent with being fired from a .22 caliber Ruger semi-automatic pistol of the

type which Mr. Nastasio had purchased from Mr. Buckley.

At approximately 9:20 a.m., Mr. Nastasio returned the Cavalier to Motorsports and got the keys to his own car. Mr. Nastasio's daughter returned home shortly after 10:00 a.m. and saw that Mr. Nastasio's Crown Victoria was again parked in front of the house. When she went inside, she found Mr. Nastasio at home. He had showered and was wearing different clothes than those he had been wearing that morning. Mr. Nastasio was very nervous to get out of the house, and asked if he could go with his daughter and her fiance wherever they were going. While they were out, Mr. Nastasio told his daughter that the police might be at the house when they returned home and asked her to tell the police that he had been with her all morning. When they returned home around noon, the police were at the apartment. Mr. Nastasio told his daughter to leave the apartment's parking lot, but she refused to do so. She originally told police that Mr. Nastasio had been with her all morning, but later said this was not the case. At trial, she testified that sometime after the shooting she found a short, dark-haired wig in her father's car.

Mr. Nastasio was charged by indictment with the class A felony of first degree murder, the class A felony of armed criminal action, and the class D felony of unlawful use of a weapon. The jury found Mr. Nastasio guilty on all three counts, and the judge sentenced him to concurrent terms of life in prison for murder, three years for armed criminal action, and one year for unlawful use of a weapon. This appeal followed.

## II. ADMISSIBILITY OF TESTIMONY REGARDING VICTIM'S FEAR OF MR. NASTASIO AND OF OBTAINING AN EX PARTE ORDER AGAINST HIM

■ As his first point on appeal, Mr. Nastasio claims that the trial court erred in allowing a witness to testify that Ms. Highbarger was afraid of Mr. Nastasio. He claims that this evidence of the victim's fear of him was not relevant to the issues at trial and unduly prejudiced the jury.

More specifically, Helen Deicidue, Ms. Highbarger's neighbor, testified that Ms. Highbarger had changed her telephone number after Mr. Nastasio moved out, and that Mr. Nastasio asked Ms. Deicidue for Ms. Highbarger's new number. When the prosecutor asked Ms. Deicidue if she knew why Ms. Highbarger had changed her number, defense counsel objected. The trial court overruled the objection and also denied defense counsel's subsequent motion for a mistrial. Ms. Deicidue then testified that Ms. Highbarger had changed her phone number because Mr. Nastasio had been contacting her.

Ms. Deicidue also testified that she spoke to Ms. Highbarger the night before the murder. When the prosecutor asked if Ms. Highbarger said she was scared of Mr. Nastasio, defense counsel objected on the basis of hearsay and requested a mistrial. The court overruled the objection and allowed the prosecutor to rephrase the question. Ms. Deicidue then testified:

> She had been to court that afternoon trying to get an *ex parte* order [of protection] and she had indicated that she didn't think that he had been served, and she was very disturbed about that and her very final words to me were, "I'm afraid that he's going to kill me before I ever get the *ex parte* order."

On appeal, Mr. Nastasio argues that Ms. Deicidue's testimony constituted inadmissible hearsay because it was an out-of-court statement used to prove the truth of the matter asserted. *State v. Chambers*, 891 S.W.2d 93, 102–03 (Mo. banc 1994). The State argues, however, that although the statement was hearsay it was admissible under the "state of mind" exception to the hearsay rule as evidence of her fear of Mr. Nastasio at the time she made the statement.

■ We agree that statements of a victim's fear of the defendant can be admissible under the state of mind exception to the hearsay rule. We also note, however, that in *State v. Bell*, 950 S.W.2d 482 (Mo. banc 1997), the Missouri Supreme Court reaffirmed that the state of mind exception only permits admission of the statements "in limited situations when they are relevant and the relevan-

cy outweighs their prejudicial effect." *Id.* at 483 (quoting *State v. Boliek*, 706 S.W.2d 847, 850 (Mo. banc), *cert. denied*, 479 U.S. 903, 107 S.Ct. 302, 93 L.Ed.2d 276 (1986)). *See also State v. Shurn*, 866 S.W.2d 447, 458 (Mo. banc 1993), *cert. denied*, 513 U.S. 837, 115 S.Ct. 118, 130 L.Ed.2d 64 (1994). The Court also cautioned that because of the danger that the jury might be inclined to consider statements about a victim's fear of the defendant for purposes other than the limited state of mind exception under which they are admissible, the use of that exception "is generally limited to cases where hearsay declarations of mental condition are especially relevant—particularly where the defendant has put the decedent's mental state at issue by claiming accident, self-defense or suicide." *Id.* at 483.

In support of this rule, *Bell* cited *State v. Singh*, 586 S.W.2d 410 (Mo.App.1979). In *Singh*, the defendant claimed that the trial court erred in allowing the victim's neighbor to testify that the victim said she was afraid of the defendant. *Id.* at 417. *Singh* undertook an extensive analysis of the state of mind exception to the hearsay rule and concluded that there were three well-defined categories in which the relevancy of state of mind had been established: cases involving the defenses of self-defense, suicide, and accidental death. *Singh*, 586 S.W.2d at 419.

The cases relied on by the State to support its argument that we should affirm admission of the victim's statements to Ms. Deicidue about her fear of defendant all involve either accident, suicide, or self-defense. *See, e.g.*, *Boliek*, 706 S.W.2d at 850 (defendant claimed death was accidental); *Shurn*, 866 S.W.2d at 458–59 (Supreme Court concluded that defendant's argument that the victim was the aggressor was similar to a self-defense theory and, therefore, the victim's state of mind was relevant and admissible).

In contrast, in *State v. Post*, 901 S.W.2d 231 (Mo.App.1995), the Eastern District held that the victim's statements that she wanted to divorce the defendant were *not* admissible under the state of mind exception because her state of mind was not relevant to the defense. The court reasoned that, while the

defendant contended that his wife's death was accidental, the kind of accident cases in which the victim's state of mind is relevant "are those situations where the defendant as the actor causing the death is undisputed but the issue raised is whether he acted intentionally or accidentally." *Id.* at 236. Because Mr. Shurn had denied any participation in the death, the victim's state of mind was irrelevant and her statements that she wanted a divorce were inadmissible.

The same situation exists here. Mr. Nastasio pleaded not guilty and, as in *Post*, denied any participation in Ms. Highbarger's death and denied he was present when her death occurred. He did not raise the issues of self-defense, accidental death, or suicide. Therefore, the victim's fear of Mr. Nastasio was not relevant to prove that the death was intentional rather than accidental or suicide, and Ms. Deicidue's testimony that the victim was afraid of Mr. Nastasio should not have been admitted.

 The fact that this evidence was improperly admitted does not mandate reversal, however. As the Supreme Court also reaffirmed in *Bell*, a conviction will be reversed due to admission of improper evidence only if the defendant proves prejudice by showing a reasonable probability that in the absence of such evidence the verdict would have been different. *Bell*, 950 S.W.2d at 484–485. *See also State v. Barton*, 936 S.W.2d 781, 786 (Mo. banc 1996). Here, while it was error to admit the hearsay testimony that Ms. Highbarger was afraid of Mr. Nastasio, we are firmly convinced that this error was not prejudicial and that there is no reasonable probability that in the absence of such evidence the verdict would have been different. The evidence was simply cumulative of the substantial other evidence of the victim's fear of Mr. Nastasio which came in without objection. This included such evidence as Mr. Stith's testimony that Mr. Nastasio said he was going to kill Ms. Highbarger, the fact Mr. Nastasio had already assaulted the victim with a shotgun the prior month, the fact that he bought another gun and drove by Ms. Highbarger's house and work repeatedly over the following weeks, and the fact that the victim

sought and received an *ex parte* order of protection. The additional impact of Ms. Deicidue's statement that the victim had said that she feared Mr. Nastasio would kill her was negligible, and did not affect the outcome of the trial.

 Mr. Nastasio also claims that the trial court erred in allowing Ms. Deicidue to testify that Ms. Highbarger sought an *ex parte* order of protection against him the day before she was murdered. A defendant suffers no prejudice and cannot complain about the admission of evidence over objection where similar evidence is admitted without objection. *State v. Taylor*, 943 S.W.2d 675, 678 (Mo.App.1997); *State v. Shaw*, 915 S.W.2d 775, 783 (Mo.App.1996); *State v. Jones*, 854 S.W.2d 60, 62 (Mo.App.1993). Mr. Stith testified that after the July 21, 1994, incident when Mr. Nastasio came to the house with a shotgun, Mr. Stith helped Ms. Highbarger get an *ex parte* order of protection against Mr. Nastasio. Mr. Nastasio made no objection to this testimony. Therefore, he suffered no prejudice from the admission of Ms. Deicidue's testimony on this issue. In addition, the fact that Ms. Highbarger sought an *ex parte* order of protection against Mr. Nastasio was relevant to motive. Mr. Nastasio was angry about being served with the order. Ms. Deicidue testified that Mr. Nastasio said he was going to do what he wanted even though he had been served with the order. This was relevant to show the couple's bad relationship and explained Mr. Nastasio's motive for the murder.

Therefore, Mr. Nastasio's first point is denied.

### III. PROSECUTOR'S STATEMENT DURING CLOSING ARGUMENT

 Next, Mr. Nastasio argues that the trial court abused its discretion in overruling his objections when the State claimed in closing argument that Mr. Nastasio had been served with an *ex parte* order of protection at the time of Ms. Highbarger's death. He claims that this ruling allowed the jury to consider facts that were not in evidence and could not be proven at trial.

During closing argument, the prosecutor stated:

She was trying to get an *ex parte* order. She was concerned that it hadn't been served. She didn't know that it had been served. She didn't know that, in fact, it had been served and that the defendant was upset that he had gotten his papers. Despite the fact that she changed her number, he was determined to make contact with her. In fact, regardless of having been served with an order of protection to stay away from her, he said, "I'll go where I want to go."

Defense counsel objected and moved for a mistrial on the ground that there was no evidence Mr. Nastasio had ever been served with an order of protection. The trial court overruled the objection.

■ A conviction will be reversed for improper argument only if that comment had a decisive effect on the jury's verdict. *State v. Parker*, 856 S.W.2d 331, 332 (Mo. banc 1993); *State v. Smith*, 891 S.W.2d 461, 468 (Mo.App.1994). During closing argument, a prosecutor is allowed to argue the evidence and all reasonable inferences from the evidence. *State v. Harris*, 870 S.W.2d 798, 814 (Mo. banc), *cert. denied*, 513 U.S. 953, 115 S.Ct. 371, 130 L.Ed.2d 323 (1994); *State v. Mease*, 842 S.W.2d 98 (Mo. banc 1992), *cert. denied*, 508 U.S. 918, 113 S.Ct. 2363, 124 L.Ed.2d 269 (1993).

Here, there was testimony from which it could be reasonably inferred that Ms. Highbarger had in fact obtained an *ex parte* order of protection against Mr. Nastasio. Ms. Deicidue testified that the night before the murder, Ms. Highbarger told her she had obtained an *ex parte* order. Mr. Stith also testified that he had helped Ms. Highbarger get such a protective order.

There was also testimony from which it could be reasonably inferred that the order had been served on Mr. Nastasio. Although Ms. Highbarger did not think it had been served, Mr. Nastasio told Ms. Deicidue that he had been given some papers. She stated, "He did say to me—he said, 'I've been given some papers' or 'served some papers,' and I'm not quite sure about the wording, 'and I don't like it.'" She also testified that Mr. Nastasio said even though he had received some papers, he was going to "do what he

wanted to do and go where he wanted to go." Therefore, it was a reasonable inference from the evidence that Ms. Highbarger had in fact obtained an *ex parte* order of protection against Mr. Nastasio and had it served on him.

## IV. TESTIMONY REGARDING MR. NASTASIO'S POST–ARREST SILENCE AND REQUEST FOR AN ATTORNEY

■ In his final point on appeal, Mr. Nastasio claims that the trial court erred in allowing the prosecutor to question Detective Jay Pruetting about Mr. Nastasio's post-arrest silence and request for an attorney.

Detective Pruetting testified that he questioned Mr. Nastasio at police headquarters. Detective Pruetting informed Mr. Nastasio of his *Miranda* rights and then presented him with a waiver form, but Mr. Nastasio refused to sign it. He then said he wanted to talk to an attorney and gave the officer an attorney's business card. Detective Pruetting called the attorney and then went back into the room where Mr. Nastasio was waiting to get the latter's shoes for testing. As Detective Pruetting was leaving, Mr. Nastasio said he wanted to talk to the detective. Mr. Nastasio then claimed that he had been with his daughter all day. The detective said that this story did not coincide with what Mr. Nastasio's daughter had told them. Mr. Nastasio then said he had better wait for his attorney to arrive, and Detective Pruetting left the room.

Mr. Nastasio acknowledges that he failed to object to this testimony at trial, but requests us to review for plain error. To be entitled to relief under the plain error rule, the defendant must show that the error affected his rights so substantially that a miscarriage of justice or manifest injustice would occur if the error is not corrected. *State v. Gray*, 887 S.W.2d 369, 387 (Mo. banc 1994), *cert. denied*, 514 U.S. 1042, 115 S.Ct. 1414, 131 L.Ed.2d 299 (1995); *State v. Silvey*, 894 S.W.2d 662, 671 (Mo. banc 1995). Manifest injustice depends on the facts and circumstances of the particular case, and the defendant bears the burden of establishing manifest injustice amounting to plain error. *State v. Zindel*, 918 S.W.2d 239, 241 (Mo. banc

1996). The assertion of plain error places a much greater burden on a defendant than if the defendant had preserved the issue. *State v. Bradshaw,* 845 S.W.2d 143, 144 (Mo. App.1993).

■ Mr. Nastasio claims that the trial court erred in allowing Detective Pruetting to testify that Mr. Nastasio initially asked for an attorney and then made a statement to the police, noting that the State may not use a defendant's silence after arrest and after receiving *Miranda* warnings to incriminate him. *Fletcher v. Weir,* 455 U.S. 603, 605, 102 S.Ct. 1309, 1311, 71 L.Ed.2d 490 (1982); *Doyle v. Ohio,* 426 U.S. 610, 619, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91 (1976). "Silence" includes not only a refusal to speak to the police, but also a request for an attorney. *Wainwright v. Greenfield,* 474 U.S. 284, 295, n. 13, 106 S.Ct. 634, 640–41, n. 13, 88 L.Ed.2d 623 (1986).

■ A defendant may waive this right, however, by making statements either before or after expressing a desire to remain silent. *State v. Harper,* 637 S.W.2d 342, 345 (Mo. App.1982). Here, Mr. Nastasio voluntarily spoke to Detective Pruetting after initially invoking his right to remain silent. In this circumstance, there was no miscarriage of justice in allowing the police to testify that Mr. Nastasio made a partial statement to police and then decided not to speak further when told his story did not match the account given by his daughter.

■ Mr. Nastasio also claims that it was improper to tell the jury that he terminated his statement to Detective Pruetting by asking for an attorney. It is improper to allow testimony that an interrogation terminated with the defendant's request for an attorney if the circumstances are such that the request creates an inference of guilt. *State v. Whitmore,* 948 S.W.2d 643, 648 (Mo. App.1997); *State v. Frazier,* 927 S.W.2d 378, 380 (Mo.App.1996). Circumstances creating an inference of guilt include a request for an attorney in response to a direct charge of guilt or under circumstances calling for an admission or denial. *Id.*

Assuming, without deciding, that this was a situation in which the request for an attor-ney created an inference of guilt, admission of this testimony does not require reversal. Mr. Nastasio has failed to show any manifest injustice from the admission of Detective Pruetting's testimony. As previously discussed, there was overwhelming evidence of Mr. Nastasio's guilt. The comment was a brief one, was not repeated, and was not referred to during closing argument. We think there is no reasonable probability that, in the absence of the comment, the outcome of the trial would have been different; we think the comment had no impact on the jury's decision. Indeed, in order to hold that there was a miscarriage of justice here, we would in effect be stating that the trial court should have *sua sponte* declared a mistrial due to this limited question and answer about Mr. Nastasio's actions at the police station. This is not the case. Accordingly, we affirm.

All concur.