**STATE of Missouri, Respondent,**

v.

**Elmer L. TYRA, Appellant.**

**No. 26173.**

Missouri Court of Appeals,
Southern District,
Division Two.

Jan. 21, 2005.

Ellen H. Flottman, Columbia, appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Lisa M. Kennedy, Asst. Atty. Gen., Jefferson City, respondent.

ROBERT S. BARNEY, Judge.

Elmer Tyra ("Appellant") was convicted by a jury of statutory sodomy in the first degree, pursuant to section 566.062.[1] Appellant was sentenced by the trial court to thirty years imprisonment in the Missouri Department of Corrections.

On appeal, Appellant posits two points of trial court error, discussed more fully below, relating to the trial court's admission of certain testimony given by the State's expert witness, Dr. Steve Larsen ("Dr.Larsen"). We affirm the sentence and judgment of the trial court.

Appellant does not challenge the sufficiency of the evidence to support his conviction. *State v. Clark*, 136 S.W.3d 582, 584 (Mo.App.2004). On review, this Court views the facts and evidence in the light most favorable to the jury's verdict. *Id.*

The record reveals that Appellant was charged with "insert[ing] his penis into the anus of [B.P.]," an eleven-year-old male who was also his step-grandson.[2] According to B.P.'s trial testimony, on August 15, 2001, the day he started the sixth grade, B.P. went to Appellant's house after school.[3] He was in the front room of Appellant's home when Appellant "grabbed [him] up" and took him down the hallway toward the bathroom. In an effort to free himself, B.P. began "kicking," "screaming," and yelling "Let me go! Let me go!" but Appellant was nevertheless able to force him into the bathroom. Appellant took B.P.'s clothes off and "made [B.P.] take [Appellant's] clothes off" of him. Appellant then put his penis in B.P.'s anus. After the incident, Appellant gave B.P. $6.00, "[s]o [he] wouldn't tell" anyone what had happened. Appellant also threatened to kill him if he told.

B.P. admitted Appellant had sodomized him on five or six earlier occasions, commencing when he was either five or six years of age and usually when Appellant was intoxicated. He related that he loves Appellant because he is his grandfather, but he is "disappointed with him ... [b]ecause [he] trusted him."

B.P. did not immediately tell anyone what had happened at Appellant's home. He related he was scared. The day following the incident in question, when B.P.'s mother ("Mother") left to play bingo, B.P. and his "brother got in a fight, and [B.P.] grabbed a knife and threatened to kill [him]self." B.P. stated that, at the time, he had been upset with Appellant and his "brother [had] just made [him] mad." This prompted Mother to take him to the Missouri Delta Medical Center for obser-

---

1. Statutory references are to RSMo 2000, unless otherwise specified.

2. Due to the sensitivity of the issues in this matter, we use the initials of the victim in order to protect his identity.

3. At the time of trial, B.P. was fourteen years old.

vation. The next morning, B.P. was sent to Bootheel Mental Health and then to Kennett First Steps, an inpatient psychiatric hospital, where he stayed for four days.[4]

As detailed above, following a jury trial, Appellant was convicted of one count of sodomy in the first degree. This appeal followed.

Trial courts have broad discretion in determining whether to admit or exclude testimony, and an appellate court will reverse only upon a showing of a clear abuse of discretion. *State v. Simmons*, 944 S.W.2d 165, 178 (Mo. banc 1997). A trial court will be found to have abused its discretion when a ruling is " 'clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration....' " *State v. Brown*, 939 S.W.2d 882, 883 (Mo. banc 1997) (quoting *Shirrell v. Missouri Edison Co.*, 535 S.W.2d 446, 448 (Mo. banc 1976)). The trial court's action cannot be considered an abuse of discretion if reasonable persons could differ about the propriety of those actions. *Id.*

"We review trial court decisions regarding the admissibility of evidence 'for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial.' " *State v. Santillan*, 1 S.W.3d 572, 579 (Mo. App.1999) (quoting *State v. Tokar*, 918 S.W.2d 753, 761 (Mo. banc 1996)). A conviction will not be reversed because of improper admission of testimony which is not prejudicial to defendant. *State v. Nastasio*, 957 S.W.2d 454, 459 (Mo.App.1997). "The burden is on defendant to show both error and the resulting prejudice before reversal is merited...." *State v. Leisure*, 796 S.W.2d 875, 879 (Mo. banc 1990). "[A] conviction will be reversed due to admission of improper evidence only if the defendant proves prejudice by showing a reasonable probability that in the absence of such evidence the verdict would have been different." *Nastasio*, 957 S.W.2d at 459.

In his first point on appeal, Appellant asserts the trial court abused its discretion in allowing certain testimony by Dr. Larson. Specifically, Appellant maintains Dr. Larsen should not have been allowed to testify that Mother "told him that she remembered that someone in the vicinity of their home had a history of sexually abusing people and [B.P.] had contact with this person on a regular basis...." According to Appellant, Dr. Larsen's testimony was "hearsay and inadmissible propensity evidence which was more prejudicial than probative."

Dr. Larsen offered extensive testimony at trial regarding his treatment of B.P.[5] Dr. Larsen testified that when he was first treating B.P., he administered a Rorschach test to determine if B.P. was really hearing voices as he had claimed. Dr. Larsen interpreted B.P.'s test answers as "being very, very guarded" and typical of those given by children who are hiding some type of secret. When B.P.'s mental stability did not improve with the use of medication, Dr. Larsen talked with Mother

---

4. Thereafter, on September 7, 2001, B.P. was sent to St. Joseph Mental Hospital in Saint Charles, Missouri, for six days for threatening to kill himself and his classmates with a pencil.

5. The record reveals that Dr. Larsen had first seen B.P. in January of 2001. B.P. had been referred to Dr. Larsen for counseling by his family doctor because he was having behavioral problems at school. He was on medication for attention deficit hyperactivity disorder, had a history of throwing temper tantrums, was not performing well at school, and was having difficulty making friends.

about the "up and down" status of B.P.'s mental health.

Dr. Larsen again spoke with Mother following B.P.'s admission to inpatient care in Saint Charles, Missouri, in September of 2001. In relating what he had discussed with Mother in that meeting, Dr. Larsen stated, "In that session, she reported remembering that someone in the vicinity—." At that time, Dr. Larsen was interrupted by an objection from Appellant's counsel. Defense counsel objected based on the belief that Dr. Larsen was making a veiled reference to Appellant as being "someone in the vicinity," and such testimony would be a violation of a pre-trial motion in limine.[6] The trial court overruled the objection on the basis that the testimony was "not hearsay;" was part of Dr. Larsen's treatment of B.P.; and, was "part of his diagnosis of the child." The trial court further stated he would allow the statement as long as Dr. Larsen did not specifically refer to Appellant.

Thereafter, the State asked Dr. Larsen if he had "learn[ed] something . . . regarding possible other reasons . . . why [B.P.] may be acting the way he was?"

Dr. Larsen replied, "His mother reported to me that she remembered that somebody in the vicinity of their home had a history of sexually abusing people, and that [B.P.] had contact with this person on a regular basis."

As a result of his discussion with Mother, Dr. Larsen called the inpatient facility where B.P. was being treated and advised "them that there was a possibility that" B.P. had been sexually abused.

■ Hearsay is an out-of-court statement offered to prove the truth of the mattered asserted. *State v. Sutherland*, 939 S.W.2d 373, 376 (Mo. banc 1997).

Courts generally exclude hearsay statements because of the inherent lack of trustworthiness accompanying such testimony. *State v. Link*, 25 S.W.3d 136, 145 (Mo. banc 2000). "[T]he hearsay rule is designed to protect a party from out-of-court declarations of other persons who cannot be cross-examined as to the bases of their perceptions, the reliability of their observations, and the degree of their biases." *State v. Brown*, 833 S.W.2d 436, 438 (Mo.App.1992). Hearsay testimony is generally not trustworthy because the out-of-court statement is not offered under oath, and neither the judge nor the jury is able to judge the declarant's demeanor in assessing witness credibility. *Link*, 25 S.W.3d at 145.

■ However, not all out-of-court statements are hearsay. It is important to note that "[i]f the statement is not offered for the truth of the matter asserted, there is no basis for requiring the proponent of the testimony to fit within an exception to the hearsay rule because the testimony is not hearsay." *State v. Foust*, 920 S.W.2d 949, 954 (Mo.App.1996). Accordingly, "[e]vidence is hearsay only if its evidentiary value depends on drawing an inference from the truth of the statement.'" *Sutherland*, 939 S.W.2d at 377 (quoting JOHN C. O'BRIEN & ROGER L. GOLDMAN, FEDERAL CRIMINAL TRIAL EVIDENCE 345 (1989) (emphasis omitted)). " 'If the relevance of the statement lies in the mere fact that it was made, no reliance is placed on the truth of the statement or the credibility of the out-of-court declarant, and the statement is not hearsay.'" *Id.*

■ Here, Dr. Larsen's statement was not "classic hearsay" as asserted by Appellant. We observe that the statement was not being offered to prove that Mother's

6. Prior to trial, the trial court sustained defense counsel's motion in limine to preclude reference to any previous uncharged acts of sexual misconduct on the part of Appellant.

statement to Dr. Larsen was true, and, accordingly, was not hearsay. *See Foust,* 920 S.W.2d at 954. The statement was being offered to explain the subsequent conduct of Dr. Larsen as related to the potential treatment of B.P.'s mental health issues. A statement offered to explain the subsequent conduct of one who heard the statement is not inadmissible hearsay. *Leisure,* 796 S.W.2d at 880.

 We acknowledge, of course, that a criminal defendant has a right to be tried only for the offense for which he is charged. *State v. Pennington,* 24 S.W.3d 185, 189 (Mo.App.2000). "The general rule concerning the admission of evidence of uncharged crimes, wrongs, or acts is that evidence of prior uncharged misconduct is not admissible for the purpose of showing the propensity of the defendant to commit such crimes." *State v. Burns,* 978 S.W.2d 759, 761 (Mo. banc 1998). " 'Proffered evidence will run afoul of th[is] rule … if it shows that the defendant has committed, been accused of, been convicted of or definitely associated with another crime or crimes.' " *State v. Wallace,* 952 S.W.2d 395, 397 (Mo.App.1997) (quoting *State v. Hornbuckle,* 769 S.W.2d 89, 96 (Mo. banc 1989)). "The necessary nexus between the defendant and the uncharged crime does not exist when the defendant's involvement in the other crime is speculative, when the defendant is not identified as the perpetrator, or when the other crime is attributed to someone other than the defendant." *Briscoe,* 913 S.W.2d at 814–15. It is Appellant's burden to show that the challenged testimony constituted evidence of other crimes. *Wallace,* 952 S.W.2d at 397.

 Here, Dr. Larsen's statement neither mentioned Appellant by name nor even vaguely referenced him. Dr. Larsen simply stated that Mother remembered "somebody in the vicinity of their home had a history of sexually abusing people."

Further, there was simply no "necessary nexus" between Appellant and Dr. Larsen's mention that Mother believed B.P. had been exposed to an abuser. *See Briscoe,* 913 S.W.2d at 814–15. Similarly, Dr. Larsen's statement contained no "clear evidence associating [A]ppellant with other crimes." *Hornbuckle,* 769 S.W.2d at 96. Appellant has not met his burden of proving that the challenged testimony constituted evidence of other crimes. *See Wallace,* 952 S.W.2d at 397. Point denied.

Appellant's second point on appeal alleges the trial court abused its discretion in overruling defense counsel's objection to a portion of Dr. Larsen's testimony which "improperly bolstered [B.P.'s] credibility." Appellant maintains Dr. Larsen's testimony amounted to "an impermissible opinion of another witness' credibility," thus "usurping the function of the jury."

At trial, B.P. testified that he came into contact with a young man named R.W. during his six day stay at St. Joseph Mental Hospital in September of 2001. According to B.P.'s trial testimony, he and R.W. engaged in consensual anal and oral sex because he "didn't know that it was bad." However, B.P. admitted that when he first talked about the incident to Dr. Larsen he stated that R.W. forced him to engage in the aforementioned activity. B.P. said that he made those allegations "[b]ecause [he] was scared everyone would be mad at [him]."

Dr. Larsen testified in regard to B.P.'s encounter with R.W. that B.P. did, indeed, initially tell him that R.W. forced him to engage in certain sexual activity. At trial, Dr. Larsen stated he had been surprised to learn B.P. had not told him the truth about the incident. At that time, Appellant's counsel objected to Dr. Larsen's statement on the basis that the State was "asking [Dr. Larsen] to comment on the

credibility of another [witness, B.P.]." The trial court overruled the objection.

Dr. Larsen went on to state that:

[a]lthough [B.P.] had been extremely guarded with [him] in the past, there had only been one situation where he had not told [him] the truth about something.... So, this [incident with R.W. was] the first time that [he] had any evidence of [a] blatant untrue story from [B.P.] in [their] counseling.

He further testified that with children who "have a history of being abused, it's very common for them to change their stories and to—to not tell the truth about things ... [b]ecause there is a lot of fear and a lot of confusion behind that particular issue...." Dr. Larsen recalled that when he confronted B.P. about the situation with R.W., he informed B.P. that if the information he had received from Bootheel Mental Health was true, then he was "concerned about where [someone B.P.'s age] learned to do th[at] type of behavior." Dr. Larsen stated he had been concerned because "children at that age typically do not anally penetrate another person, especially another boy, unless they've been taught that behavior in some way."

"Generally, it is within the trial court's sound discretion to admit or exclude an expert's testimony." *Johnson v. State*, 58 S.W.3d 496, 499 (Mo. banc 2001). "The purpose of expert testimony is to assist the jury in areas which are outside of everyday experience or lay expertise." *State v. Sensabaugh*, 9 S.W.3d 677, 680 (Mo.App.1999). Due to the fact that " 'expert testimony is always fraught with questions of relevancy and competency, the decision to admit expert conclusions is a matter of trial court discretion that will not be overturned on appeal absent an abuse of discretion.' " *State v. Knese*, 985 S.W.2d 759, 768 (Mo. banc 1999) (quoting

*State v. Skillicorn*, 944 S.W.2d 877, 891 (Mo. banc 1997)).

As a general rule, expert testimony is inadmissible if it relates to the credibility of witnesses. *State v. Middleton* 998 S.W.2d 520, 527 (Mo. banc 1999). "Expert testimony that comments directly on a particular witness' credibility, as well as expert testimony that expresses an opinion with respect to the credibility or truthfulness of witnesses of the same type under consideration invests 'scientific cachet' on the central issue of credibility and should not be admitted." *State v. Williams*, 858 S.W.2d 796, 800 (Mo.App. 1993). "Expert testimony presents the danger that jurors may be over-awed by the evidence, or may defer too quickly to the expert's opinion." *Id.*

It has been found that there are generally two types of expert testimony challenged in child sexual abuse cases:

1) general testimony describing behaviors and other characteristics commonly observed in sexually abused victims (often called general 'profile' testimony); and 2) particularized testimony concerning the alleged victim's credibility. While the trial court has great discretion in admitting the former, the latter usurps the province of the trier of fact and is inadmissible.

*Williams*, 858 S.W.2d at 798–99 (citation omitted). Our courts allow that "[g]eneral profile evidence of child sexual abuse victims can be a proper topic of expert testimony, because such testimony assists the jury in understanding the behavior of sexually abused children, a subject beyond the range of knowledge of the ordinary juror." *State v. Bowler*, 892 S.W.2d 717, 720 (Mo. App.1994).

Appellant argues the present expert testimony is akin to that found in *Williams*. We disagree. In *Williams*, an expert gave testimony related not only to the typical

behaviors associated with a child that has been sexually abused, but he also personalized his testimony by stating, "... in this case ... [t]he nurse asked her, and she spontaneously [indicated] who had sexually abused her.... Incidents of lying among children [are] very low, less than three percent. And as I said, the physical findings and the behavioral indicators can only support what the child says...." *Williams,* 858 S.W.2d at 800. In reversing the defendant's conviction, the *Williams* court held that the expert's testimony "went beyond admissible testimony concerning general, behavioral characteristics of sexually abused children;" "vouch[ed] too much for the victim's credibility;" and, "included improper quantification of the probability of the complaining witness' [sic] credibility." *Id.* at 801.

The present situation differs from that found in *Williams.* Here, Dr. Larsen's testimony that B.P. was generally truthful in his treatment sessions with him was in no way a direct comment on the veracity of B.P.'s *trial testimony or overall credibility* as a witness. His statements largely consisted of observances of several behavioral indicators in B.P. that were consistent with sexual abuse and helped to explain B.P.'s ongoing behavioral problems. The primary conclusion drawn by Dr. Larsen was that, in his opinion, B.P. exhibited several behavioral indicators consistent with a child that has been sexually abused. As stated in *Williams,* it is "appropriate for an expert to testify that a child demonstrates age-inappropriate sexual knowledge or awareness, and that a child's behaviors are consistent with a stressful sexual experience." *Williams,* 858 S.W.2d at 800. This latter type of testimony falls squarely within the rule that "general testimony describing behaviors and other characteristics commonly observed in sexually abused victims (often

called general 'profile' testimony)" is admissible. *Id.* at 798.

In our view, Dr. Larsen's testimony did not "invade[ ] the province of the jury" and was allowable expert testimony. *Link,* 25 S.W.3d at 143. The jury was free to give Dr. Larsen's testimony the weight they thought it deserved and to draw the inferences they believed should be drawn from the evidence presented. *See State v. Calvert,* 879 S.W.2d 546, 549 (Mo.App.1994). As such, the trial court did not abuse its discretion in allowing the testimony. Point two is denied.

We affirm the judgment of the trial court.

PARRISH, P.J., and BATES, C.J., concur.