**STATE of Missouri, Plaintiff–Respondent,**

v.

**Leon THOMAS, II, Defendant–Appellant.**

**No. SD 29218.**

Missouri Court of Appeals, Southern District, Division One.

June 30, 2009.

Nancy A. McKerrow, Columbia, MO, for Appellant.

Chris Koster, Atty. Gen., Daniel N. McPherson, Asst. Atty. Gen., Jefferson City, MO, for Respondent.

JEFFREY W. BATES, Judge.

Leon Thomas (Defendant) appeals from his convictions on multiple counts of statutory sodomy and statutory rape involving two victims. Defendant contends the trial court abused its discretion in permitting expert testimony on the methodology used in interviewing alleged child sexual abuse victims because the testimony improperly vouched for the victims' credibility. This Court affirms.

## I. Factual and Procedural History

In 2006, Defendant was charged by information with three counts of statutory sodomy in the first degree and two counts of statutory rape in the first degree involving two sisters, A.P. and M.M. (collectively, the Victims). *See* §§ 566.062, 566.032.[1] Following a jury trial, Defendant was convicted of all five counts. He was sentenced to serve 10–year concurrent terms for the first three counts. The sentences on these counts were to run consecutively to the 10–year concurrent terms for the remaining two counts for a total of 20 years imprisonment.

Defendant does not challenge the sufficiency of the evidence to sustain his convictions. On appeal, this Court considers the facts and all reasonable inferences derived therefrom in a light most favorable to the verdict, and rejects all contrary evidence and inferences. *State v. Newberry,* 157 S.W.3d 387, 390 (Mo.App.2005); *State v. Cravens,* 132 S.W.3d 919, 921 (Mo. App.2004). Viewed from that perspective, the favorable evidence supporting the State's case against Defendant is summarized below.

A.P. was born in October 1990. Her sister M.M. was born in June 1992. Their mother is K.T. (Mother). When A.P. was two years old, Mother married Defendant.

Between January 2001 and January 2005, Defendant lived in a trailer in Ava with Mother and her daughters. After Defendant moved out of the home, the Victims disclosed to Mother that Defendant had sexually abused them. In January 2006, Mother took the Victims to the Douglas County Sheriff's Department. They spoke with Deputy Vernon Johnson, who contacted the Child Advocacy Center (CAC) in Springfield to arrange for the Victims to be interviewed in February. The Victims each were interviewed by

---

1. All references to statutes are to RSMo (2000). All references to rules are to the Missouri Court Rules (2009).

CAC forensic interviewer Micki Lane (Lane). Lane's interview with M.M., then age thirteen, was videotaped.

In July 2006, Defendant was charged by information with one count of statutory rape and two counts of statutory sodomy for acts involving A.P. (Counts I, II and III), and one count each of statutory rape and statutory sodomy for acts involving M.M. (Counts IV and V).

Prior to trial, Defendant filed a pre-trial motion in limine to prevent the State from eliciting opinion testimony about the credibility of any witnesses, including the Victims. At a pre-trial hearing, defense counsel indicated that she expected the prosecutor to ask Lane about how a forensic interview should be conducted and what indicia of reliability they look for in conducting such an interview. The prosecutor responded that she was not going to ask Lane whether the Victims showed any of the indicators that Lane looks for in conducting a forensic interview, nor did she plan to ask Lane whether the Victims were credible. The court overruled the motion in limine.

In April 2008, a three-day jury trial was held. Before Lane testified, Defendant renewed his motion and was granted a continuing objection. Lane testified about her forensic interviews with the Victims, and the videotaped interview of M.M. was shown to the jury. In addition, both A.P. and M.M. testified. As of the date of trial, A.P. was 17 years old; M.M. was 15 years old. The following is a summary of their testimony.

A.P. testified that Defendant's sexual abuse of her began in 2001 when she was 11 years old. Defendant called A.P. into Defendant's room, where he asked A.P. to remove her underwear. Defendant then placed his finger into A.P.'s vagina. This same type of activity continued over a period of about sixteen months. During that time frame, Defendant also had A.P. use her hand to touch Defendant's penis. Defendant began having sexual intercourse with A.P. when she was 12 or 13 years of age. The first incident happened when A.P. was home alone with Defendant. He called A.P. into Defendant's bedroom and asked her to remove her clothes. Defendant then got undressed, put on a condom, told A.P. to lie on the bed, pushed her legs up and had sexual intercourse with her. Defendant sometimes fondled A.P.'s breasts while having intercourse with her. He continued having intercourse with A.P. on multiple occasions. When Defendant did not use a condom, he would pull out before ejaculating. He also forced A.P. to perform oral sex and sometimes put his hand on the back of her head to make her go faster. Defendant warned A.P. not to tell anyone because her mother or grandfather might kill him, or he might go to jail for a very long time. A.P. did not tell anyone because she still loved Defendant and was scared for his safety.

M.M. testified that Defendant's sexual abuse of her began in 2003, when she was 11 years old. Defendant began by touching M.M. "where a dad shouldn't touch ... around the breast area." After a few months of that behavior, Defendant began inserting his fingers into M.M.'s vagina. Most of these incidents happened in Defendant's bedroom. About six months to a year later, Defendant began having sexual intercourse with M.M. The first incident happened as M.M. had finished taking a shower. Defendant led M.M. into Defendant's bedroom, took his pants off, put on a condom, and laid M.M. down on the bed and had intercourse with her. Defendant continued having intercourse with M.M. on multiple occasions. He would usually use a condom, but when he did not, he would pull out before ejaculating. Defendant would touch M.M.'s breasts while he was

having intercourse with her. Other people were sometimes in the house when this happened and Defendant would kiss M.M. or put his hand over her mouth to keep her from making any sounds. Defendant forced M.M. to touch his penis with her hand on one or two occasions. He asked her to perform oral sex on him one time, but she was so scared of doing it that he did not ask her again. Defendant initially told M.M. that, if she told anyone, her mother would kill Defendant or he would go to jail. He later began telling M.M. that he would kill her mother, her sisters or her friend if M.M. said anything about what was happening. M.M. tried to prevent the abuse by hiding on the bunk bed and by scattering plastic toys all over the floor of her room to discourage Defendant from entering.

In addition to the forensic interviews with Lane, the Victims also underwent SAFE exams.[2] Each exam showed normal physical findings. The nurse who conducted the exams testified that normal physical findings were common in SAFE exams and did not disprove that sexual abuse took place. The nurse concluded that the history and behavior of each of the Victims were consistent with sexual abuse or sexual assault.

Defendant did not testify or present any evidence. The jury found Defendant guilty on all five counts of the information. He had waived jury sentencing prior to trial. In July 2008, the court sentenced Defendant to ten years imprisonment on each count. At the sentencing hearing, the court specified that terms of imprisonment on Counts I, II and III relating to A.P. were to be served concurrently to

each other. The terms of imprisonment on Counts IV and V relating to M.M. were to be served concurrently to each other. The judge ordered, however, that the sentences on the first three counts were to be served consecutively to the sentences imposed for the latter two counts.[3] Defendant filed a motion for new trial, in which he included his allegation that the trial court erred in admitting Lane's testimony. This appeal followed. Additional facts will be disclosed as necessary to address Defendant's point below.

## II. Discussion and Decision

■ In Defendant's single point relied on, he contends the trial court abused its discretion in permitting Lane to testify about her forensic interviews with the Victims. A trial court has broad discretion in deciding whether to admit or exclude evidence at trial. *State v. Forrest*, 183 S.W.3d 218, 223 (Mo. banc 2006). The trial court's decision will be reversed only if it has clearly abused this discretion. *Id.* An abuse of discretion occurs when a ruling is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration. *Id.* In addition, this Court reviews for prejudice, not mere error, and will reverse only if prejudice is found. *Id.* at 223–24; *State v. Tabor*, 219 S.W.3d 769, 772 (Mo.App.2007). The following additional facts concerning Lane's testimony are germane to our discussion of this point.

Lane had been a forensic interviewer at the CAC in Springfield since October of 2000. The purpose of the CAC was to reduce the number of interviews with the child to avoid redundant interviews, which

---

2. A "SAFE" exam is an abbreviation for Sexual Abuse Forensic Examination.

3. The judgment states that the sentences on the first three counts were to run consecutively to each other and concurrently to the latter two counts, which is inconsistent with the court's oral pronouncement of the sentences.

add stress to the children and families. Additionally, children must be interviewed differently than adults because they think differently, speak differently, understand questions differently, and understand expectations differently. It was important to Lane to know where the child may be in his or her "process of disclosure." This means a child may originally deny that something has happened, or the child may be tentative in disclosing abuse out of fear of retribution, not being believed, or causing a family disruption. According to Lane, some children are active in disclosing abuse and provide a lot of details. Other children will disclose, recant, and then reaffirm. An interviewer must be aware of any problems or blocks that a child may have and try to discover them during an interview. Some examples of blocks are that the child is afraid of someone or something, the child is upset, or the child has a parent or caregiver that does not believe or support them.

After discussing some of the techniques that she used in interviewing children, Lane was asked "when interviewing kids, what are some important factors that you are aware of that you look for?" That drew an objection from defense counsel that they were approaching "dangerous ground" as to "why these girls' statements may or may not be more or less credible." The prosecutor then explained that she was asking "about general problems in interviewing children. I am not asking [Lane] to say whether these kids are credible or not." The court overruled the objection.

Lane testified that it is important to "source monitor," which means trying to determine if the information the children are providing is something they experienced firsthand, as opposed to information they got from someone else. Lane said that it is important to not try and change the language that the child uses, even if it is vulgar, because that could block the child's ability to give an appropriate disclosure.

When the prosecutor asked Lane what things her training had taught her to look for when interviewing children, defense counsel renewed her objection, which the court overruled. Lane answered that in addition to source monitoring, she looks at "experience-based" information, which is more specifically described as "tactile-type information":

A. Well, as I spoke before, I do look at source monitoring, so that is one thing. I'm also looking again, I've got experience-based types of information, and what I mean more specifically is tactile-type information. Things that they felt, tasted, saw, things that aren't typically told if the source was not experience-based. I'm also looking at where they're at in their process of disclosure or any other blocks that are coming up as we are talking about things, and also trying to gauge their comfort level in the interview. I'm sure there's other things I can't think of right now.

Q. Are you also monitoring to see if you find any evidence of coaching?

A. That's part of the source monitoring that I'm looking at. Consistency within my interview. It is not my job to affirm or confirm or reaffirm what the child has said prior to coming to the interview or what someone else has said that the child has disclosed. I never expect that the information I'm given before the interview to be exactly, or many times even near, what the child disclosed in the interview. My job is just to listen to them today about what they have to say.

Q. Is it important to you to know whether or not threats were made to a child?

A. Yes. Again, that's part of the block that can happen. There are familial blocks and—

Defense counsel at that point renewed her objection, stating that Lane was "going down the list of what these girls testified to." The court overruled the objection.

Lane then reiterated that it was not her job to confirm the same things that a child may have told other people. She described her job as "to allow the confidence of the child to rise to the point that they can express whatever has or hasn't happened in their own words in a child-friendly environment." Lane also made it clear that it was not her job to draw a conclusion about whether or not a child had been sexually abused. She then provided a foundation for the videotaped interview of M.M., which was admitted into evidence as State's Exhibit 1. Before the tape was played for the jury, the prosecutor asked Lane to answer the question previously interrupted by defense counsel's earlier objection, about whether it was important to know whether a threat had been made to a child. Lane responded that it was one of the blocks she would look at. She described the main blocks as familial-induced, personally introduced, setting, perpetrator-induced, and interviewer-induced. Lane said that threats could be familial or perpetrator-induced.

Lane then testified about "script memory," which she said is present in adults as well as children. Lane described the concept as not being able to recall the specific details of a past event that happened on numerous occasions, such as an anniversary celebration, but instead saying that such an event usually happened in a certain way. When something unusual or out of the ordinary happens on an anniversary, however, then a person can usually recall more specific information about it. After Lane's direct testimony, Defense counsel did not ask any cross-examination questions.

In closing, the prosecutor mentioned Lane's references to source monitoring, experience-based information and script memory in evaluating M.M.'s testimony:

Lane told you that there were certain things she looked for in child interviews. One of those were [sic] source monitoring and experience-based information that a kid provided. Think about what [M.M.] told you. She gave you information about what she saw, what she didn't want to see, and what she was doing at the time, because why did she—why was she able to say this? Because it was happening to her and this defendant subjected her to it.

. . . .

[M.M.] remembered the very first time this defendant touched her inappropriately . . . when he started touching her like a father shouldn't. Well, she remembers that because that's the time that changed their relationship. That's very indicative that [M.M.'s] remembering things with script memory, which is what Micki Lane talked about.

Defendant argues the trial court abused its discretion in permitting Lane to testify about what she looks for when interviewing a child who has alleged sexual abuse because Lane's testimony "invaded the province of the jury" and "was tailored to the facts" in this case. Defendant specifically argues that, except for the legitimate need for Lane to lay the foundation for the admission of M.M.'s videotaped interview, "[a]ll the rest of Lane's testimony was used to vouch for A.P.'s and M.M.'s credibility and that is improper." Defendant relies primarily on cases in which an expert vouches for the victim's credibility.

*See, e.g., State v. Taylor,* 663 S.W.2d 235, 240–41 (Mo. banc 1984) (holding inadmissible testimony from a psychiatrist that the victim was not fantasizing when she described the rape); *State v. Williams,* 858 S.W.2d 796, 800–01 (Mo.App.1993) (holding inadmissible testimony from a doctor who said that sexually abused children "essentially don't lie"); *State v. Foster,* 244 S.W.3d 800, 803 (Mo.App.2008) (holding inadmissible testimony from a doctor that most of his sexual-abuse complainants are telling the truth based on his years of training and experience in giving him a sense about children's truthfulness). Defendant's argument is completely without merit.

■ Generally, two types of expert testimony are challenged in child sexual abuse cases: (1) general testimony describing behaviors and other characteristics commonly observed in sexually abused victims; and (2) particularized testimony concerning the alleged victim's credibility. *State v. Churchill,* 98 S.W.3d 536, 539 (Mo. banc 2003); *State v. Price,* 165 S.W.3d 568, 572–73 (Mo.App.2005); *State v. Collins,* 163 S.W.3d 614, 620–21 (Mo.App.2005). The latter usurps the province of the trier of fact and is inadmissible, while the trial court has great discretion in admitting the former. *State v. Tyra,* 153 S.W.3d 341, 348 (Mo.App.2005); *Williams,* 858 S.W.2d at 798–99. Testimony that describes generalized behaviors and other characteristics commonly found in child victims of sexual abuse can be a proper topic of expert testimony, "because such testimony assists the jury in understanding the behavior of sexually abused children, a subject beyond the range of knowledge of the ordinary juror." *State v. Bowler,* 892 S.W.2d 717, 720 (Mo.App.1994); *Tyra,* 153 S.W.3d at 348; *see, e.g., State v. Silvey,* 894 S.W.2d 662, 671 (Mo. banc 1995) (holding no error in allowing social worker testimony that victim displayed behavioral indicators consistent with child sexual abuse); *State v. Matthews,* 37 S.W.3d 847, 850 (Mo.App.2001) (holding admissible expert testimony of two witnesses concerning characteristics and symptoms of sexually abused victims in general, and characteristics and symptoms seen in victim at issue).

There is no question in this case that Lane's testimony was general in nature. Lane testified about techniques she used in interviewing children, and some of the general characteristics displayed by children that makes those techniques necessary. Lane did not render an opinion about whether sexual abuse actually occurred in this case. None of Lane's testimony was directed to the overall credibility of the Victims or their credibility as a witness. In fact, contrary to Defendant's argument, Lane's testimony did not speak to the Victims' credibility at all. The jurors were free to give Lane's testimony the weight they thought it deserved and to draw the inferences they believed should be drawn from the evidence presented. *Tyra,* 153 S.W.3d at 349. As such, the trial court did not abuse its discretion in allowing Lane's testimony. *Id.* Point denied.

■ While the foregoing discussion disposes of the issue presented by Defendant's appeal, there is a matter which requires further attention. The judgment contained in the record on appeal contains a clerical error. The judgment specifies that Counts I, II and III run consecutively to each other and concurrently to Counts IV and V. At the sentencing hearing, however, the judge ordered the first three counts to run concurrently to each other and consecutively to the latter two counts. "The failure to memorialize accurately the decision of the trial court as it was announced in open court was clearly a clerical error." *State v. Taylor,* 123 S.W.3d

924, 931 (Mo.App.2004). Rule 29.12 authorizes a trial court to correct clerical errors in a judgment resulting from oversight or omission. *State v. Dillard*, 158 S.W.3d 291, 305 (Mo.App.2005). Accordingly, while we affirm Defendant's convictions and sentences, we must remand this case with instructions to the trial court to enter an amended written judgment reflecting the sentences announced in open court.

BARNEY, J., and SCOTT, P.J., Concur.