

# In the
# Missouri Court of Appeals
## Western District

| | | |
|---|---|---|
| **RUSSELL DONALD WALKER,** | ) | |
| | ) | |
| **Appellant,** | ) | **WD85967** |
| | ) | |
| **V.** | ) | **OPINION FILED:** |
| | ) | **JULY 23, 2024** |
| **STATE OF MISSOURI,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**Appeal from the Circuit Court of Gentry County, Missouri**
The Honorable Roger Martin Prokes, Judge

Before Division Four: Gary D. Witt, Presiding Judge, Thomas N. Chapman, Judge and
Janet Sutton, Judge

Russell Walker ("Walker") appeals a judgment of the Circuit Court of Gentry

County, Missouri ("motion court") denying, after an evidentiary hearing, his motion for

post-conviction relief pursuant to Rule 29.15.[1]  Walker raises two points on appeal and

argues the motion court clearly erred in denying his motion for post-conviction relief

because Walker received ineffective assistance of counsel in violation of his Sixth and

Fourteenth Amendment rights under the United States Constitution, and Article I,

Sections 10 and 18(a) of the Missouri Constitution because:  Point I, trial counsel failed

---

[1] All Rule references are to the Missouri Supreme Court Rules (2023).

to cross-examine the executive director of the Children's Advocacy Center ("Director")[2] about the fact her testimony was not diagnostic of sexual abuse; and Point II, trial counsel failed to investigate and present evidence related to Walker having genital herpes and the victims being negative of STDs. We affirm the judgment of the motion court.

## Factual and Procedural Background[3]

Walker was convicted of two counts of first-degree statutory rape following a jury trial and was sentenced to a combined total of fifty years' imprisonment.[4] Walker's convictions and sentences were affirmed on direct appeal. *State v. Walker*, 549 S.W.3d 7 (Mo. App. W.D. 2018). On direct appeal, this Court summarized the facts of the underlying criminal case as follows:

> Walker's daughter, B.W., was born in August 2000. B.W. did not start living with Walker until 2009, when she and her brother moved into his apartment in Maryville. In 2011, B.W. and her brother moved with Walker to his residence in Burlington Junction. Walker was physically abusive to both B.W. and her brother. When B.W. was [ten] years old, Walker began having sexual intercourse with her. Walker continued to sexually abuse B.W. up until just before she turned [fourteen] years old in August 2014. In May, June, and July 2014, Walker had sex with B.W. every other day. Every time, Walker would tell her brother to go to his room and close the door. Then, Walker would grab B.W. by the wrist, tell her to "come on," take her into either his bedroom or the bathroom, remove their clothes, get on top of her, and stick his penis in her vagina. B.W. said that she knew

---

[2] Pursuant to section 509.520, RSMo 2023, we do not use any victim or witness names other than parties in this opinion.

[3] "On appeal from the motion court's denial of a Rule 29.15 motion, we view the facts in the light most favorable to the underlying criminal conviction as those facts bear upon the motion court's judgment." *Libeer v. State*, 686 S.W.3d 309, 312 n.1 (Mo. App. W.D. 2024)(internal citation omitted).

[4] The jury acquitted Walker of a third count, attempted first degree statutory sodomy, involving victim B.W.

2

what was going to happen when he grabbed her wrist because he had done it "a hundred times before."

B.W.'s best friend and her best friend's mother witnessed Walker behaving inappropriately with B.W. On one occasion, when Walker was dropping B.W. and her brother off at a school dance, B.W.'s friend and her mother saw Walker put his hands on B.W.'s waist and give her a prolonged kiss on the lips. B.W.'s friend's mother said that the kiss was "way too long for a parent to be kissing their child," and B.W.'s friend said that the "prolonged kiss" was uncomfortable to watch and was not the way parents usually kiss their kids. B.W.'s friend also said that, when she spent the night with B.W., she heard Walker call B.W. to come "cuddle," and she saw Walker and B.W. "spooning."

Eventually, B.W. and her brother ran away from Walker's residence and were placed in foster care. B.W. did not tell anyone about the sexual abuse until five months after they left Walker's residence. B.W. initially told her best friend, who, in turn, told her mother. B.W. then texted her own mother and disclosed that Walker had raped her. B.W. said that she waited to tell anyone about the sexual abuse because she was ashamed, embarrassed, afraid that people would judge her and make fun of her, and concerned that she and her brother would be split up if they were removed from Walker's residence.

B.W. disclosed to a Children's Advocacy Center forensic interviewer that Walker had put his penis in her vagina. B.W. had suicidal thoughts and was depressed over what happened to her and her brother. She was diagnosed with PTSD, anxiety, and depression.

The second victim in this case is N.G., who was born in November 2001. N.G. and her mother, who was dating Walker, moved in with him in 2010 when N.G. was nine years old and moved out in 2012 when N.G. was [eleven] years old. For the entire time N.G. lived with Walker, Walker had sexual intercourse with her in his bedroom every time her mother went to Walmart. Walker would drag N.G. into his bedroom, close the door, pull off her pants and his pants, and then put his penis in her vagina. N.G. did not tell her mother or anyone else about the sexual abuse because she was scared that she would get into trouble for it and be suspended from school.

3

N.G. did not know how many times Walker had sexual intercourse with her, but she said that it had gone on for three years.

A medical exam revealed that N.G. had a complete transection of her hymen, which indicated a prior penetrative injury caused by something inserted into her vagina. During a forensic interview, N.G. initially denied any sexual contact with Walker. Later in the interview, however, she disclosed that Walker had sexual intercourse with her every other night when her mother went to Walmart.

According to N.G.'s mother, while she and N.G. lived with Walker in Burlington Junction, he would encourage her to leave the house and go to Walmart, which was [twenty] miles away. Sometimes, she went to Walmart two or three times a week and would be gone for an hour. The children would be at home in bed when she left. Whenever she was out in the evening on those occasions, Walker, who never volunteered to run these errands, would frequently call her near the time she would be returning to find out if she was on her way home and where she was. B.W.'s brother said that, every time B.W. or N.G. were in Walker's bedroom with Walker, he could hear groaning noises and the bed squeaking.
. . .
Walker testified at trial that he never sexually abused either B.W. or N.G.
*Id.* at 8-10.

This Court affirmed his convictions and sentences. Walker timely filed a *pro se* motion for post-conviction relief pursuant to Rule 29.15. Walker's appointed counsel timely filed an amended motion.

Pertinent to this appeal, Walker alleged his trial counsel was ineffective for failing to adequately cross-examine Director, and had trial counsel questioned her about the "impropriety of considering delayed disclosure, inconsistent disclosures, and recantations as diagnostic tools, there is a reasonable probability the result of the trial could have been different." Further, Walker alleged his trial counsel was ineffective for failing to investigate and present evidence of Walker's genital herpes because "a positive herpes

4

test, in contrast to [B.W.] and [N.G.] showing no signs of herpes, would have provided the defense with independent evidence consistent with innocence."

On the issue of trial counsel's alleged ineffective cross-examination of Director, prior to trial, trial counsel filed a motion *in limine* to preclude introduction of evidence concerning Child Sexual Abuse Accommodation Syndrome ("CSAAS") and its components through Director's testimony.[5]  CSAAS is used to explain a child's delayed disclosure of sexual abuse and/or denial of sexual abuse, but it is not diagnostic that sexual abuse did in fact occur.  The trial court sustained the motion as to CSAAS, "but as far as the individual components thereof, if someone brushes up against those components, I don't have a problem with that being offered."  Prior to Director's testimony at trial, trial counsel renewed his objection to the presentation of CSAAS evidence which the trial court overruled.  An evidentiary hearing on Walker's 29.15 motion was held on November 10, 2022.  At the hearing, trial counsel testified that he objected to Director testifying about CSAAS because it is not a diagnostic tool, and he was concerned that testimony about the component parts would lead the jury to understand the testimony about children's disclosures or denial of abuse as affirmative proof that the sexual abuse occurred, especially if the jury was relying on the testimony of the two child victims.

Trial counsel's trial strategy, regarding Director's testimony, was to make sure Director did not start saying CSAAS was diagnostic or that the two child victims showed

---

[5] The five phases of CSAAS are:  secrecy, helplessness, entrapment and accommodation, delayed and unconvincing disclosure, and retraction.

signs of the syndrome. Trial counsel believed if he questioned Director about the components she testified about as not being diagnostic it could have opened the door to information he sought to keep out, which could have "backfired." Additionally, trial counsel's strategy was to show the jury that Director was biased based on her position with the Children's Advocacy Center and that employees of the center are "going to find sexual abuse because it [financially] benefits them to do so."

At the hearing, trial counsel also testified that at some point before trial he asked Walker if he had any sexually transmitted diseases ("STDs") and Walker replied in the negative; trial counsel recorded this in a memo for Walker's file. An investigator working with trial counsel also asked Walker two times if he had any STDs which Walker denied; this was also recorded in a memo for Walker's file. Trial counsel testified that the first time Walker said anything to him about having an STD was after the verdict was read at trial. Walker also testified at the hearing. Walker testified that he currently had herpes and got medically tested for them a few weeks after his sentencing. Walker first thought he had genital herpes around February 2009, because he started to have "major breakouts in [his] genital area." Walker stated he did not seek medical treatment because he was "ashamed and embarrassed." According to Walker, sometimes he would have these "breakouts" every month, and they would last for weeks. Walker testified his trial counsel and investigator knew about his genital herpes before trial.

On December 12, 2022, the motion court issued findings of fact, conclusions of law, and judgment denying Walker's motion for post-conviction relief. This appeal follows.

6

**Standard of Review**

On review of a motion court's denial of a post-conviction relief motion, we presume the motion court's ruling is correct. *See McIntosh v. State*, 413 S.W.3d 320, 323 (Mo. banc 2013). Our review is "limited to a determination of whether the findings and conclusions of the trial court are clearly erroneous." Rule 29.15(k). "The motion court's findings and conclusions are clearly erroneous only if, after review of the record, the appellate court is left with the definite and firm impression that a mistake has been made." *Deen v. State*, 550 S.W.3d 135, 139 (Mo. App. W.D. 2018) (internal citation omitted).

**Point I: Cross-examination**

**Analysis**

In Walker's first point on appeal, he argues the motion court clearly erred in denying his amended motion because trial counsel was ineffective in failing to cross-examine Director on the fact that her testimony was not diagnostic of sexual abuse. We disagree.

For Walker to be entitled to post-conviction relief for the ineffective assistance of counsel, he must show by a preponderance of evidence that: 1) trial counsel failed to exercise the level of skill and diligence that a reasonably competent trial counsel would in a similar situation, and 2) Walker was prejudiced by that failure. *See Shockley v. State*, 579 S.W.3d 881, 892 (Mo. banc 2019) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). "The manner in which cross-examination is conducted, and the extent of

7

cross-examination, are matters of trial strategy best left to the judgment of trial counsel."
*Wright v. State*, 669 S.W.3d 383, 389 (Mo. App. E.D. 2023) (internal quotation omitted).

Prior to and throughout trial, trial counsel sought to exclude information about CSAAS and its components through Director's testimony; however, the trial court allowed information as to CSAAS's components to be offered. At trial, Director testified she was the executive director of the Northwest Missouri Children's Advocacy Center in St. Joseph, Missouri, and that she specialized in child sexual abuse and had thirty years of experience. Director testified about what is generally accepted in her specialty about how children disclose sexual abuse:

> [State]: What does the research say that is generally accepted in your specialty about how children disclose sexual abuse?
>
> [Director]: Well, one of the most important things is that most kids do not disclose right away. Some kids never disclose. Probably about a third of the kids who have been abused would be the ones that would disclose. The rest of them do not, at least not for several years ago [sic]. Disclosure is a process. It doesn't just happen like that. It's usually -- there's two different ways they can do it: [a]ccidentally or intentionally.
> Now, most little kids would disclose accidentally. They might be riding in the car with mom and come out and say, hey, this is a fun game I played with my uncle and describe some sexual act; whereas older kids, it's more intentional. They do it on purpose. They're tired of the abuse. They're afraid. They're scared. They -- whatever is happened, they've decided it's time for them to disclose.

Director also testified about why some children do not disclose sexual abuse as soon as it happens:

> [State]: Have there been studies on the percentage of children that do not disclose sexual abuse as soon as it happens?

8

[Director]:  Yes.  Less than a third of them would do it right away.  The ones that do disclose right away, usually it's a stranger.  Someone they don't care about.  Maybe it happened one time.  Kids don't disclose right away if it's a family member or a trusted adult that they like, for many reasons, but, yeah.

Further, Director testified that children who experience sexual abuse may experience post-traumatic stress disorder, depression, suicidal thoughts and/or other behavioral changes.  Additionally, Director testified about children denying sexual abuse:

[State]:  Based on the studies and your experiences and training, is it common for a child to deny sexual abuse if asked, even though it happened?

[Director]:  It's very common.  I kind of alluded to that earlier.  They've done studies on kids where the child either has an STD or the offender admitted doing something or someone saw it happen, and then asked the child and the child will still say no.  So that is not uncommon.

On cross-examination, trial counsel engaged in the following line of questioning with Director:

[Trial Counsel]:  Based on your experience, some children do disclose immediately, correct?

[Director]:  They do, yes.

[Trial Counsel]:  Okay.  So disclosing immediately and not disclosing immediately, that does not equate to child abuse, does it?

[Director]:  Some children that are sexually abused disclose immediately, very few.  And the ones that they do, usually like I said, it would be that a stranger abused them or someone they didn't really know well or care about.  Most children do not disclose immediately because most children are abused by someone they know and trust well.

[Trial Counsel]:  It's not uncommon for a person, based on your knowledge and experience, to make partial disclosures?

9

[Director]: No, that's very common.

[Trial Counsel]: It's not uncommon, based on your experience, for people to make full disclosures at the first setting?

[Director]: I would say it's less common. I'm trying to remember how many I've heard that come out and tell every single detail and then have absolutely nothing else to tell. That would be fairly rare, but they could. Again, if it was a stranger, a one-time event, you could probably do that.

It is noteworthy that Director's testimony was brief, and Director did not testify as to anything regarding the particular victims in this case or tie her general testimony regarding child victim disclosure to either victim or relate her general testimony regarding child-victim disclosure to the facts of this case.

Walker argues trial counsel was ineffective for failing to ask Director about the fact that the component parts she testified about—denying sexual abuse, delayed reporting, and recantations—were not diagnostic of child sexual abuse. Specifically, in Director's deposition testimony, Director stated CSAAS is not a diagnostic tool to assess whether a child had been sexually abused. Walker asserts trial counsel should have elicited this testimony during cross-examination. At the post-conviction evidentiary hearing, trial counsel testified he did not question Director about whether her testimony was diagnostic because he wanted information about CSAAS kept out, and he was worried this line of questioning would have "opened the door because then it would have -- would have potentially backfired." The motion court found trial counsel was not deficient in his cross-examination of Director because "[t]estimony about CSAAS would

10

have opened the door to testimony that trial counsel successfully kept out of the trial in limine."[6]

The issue of whether a cross-examination of Director would have *actually* "opened the door" to more information about CSAAS being admitted at trial is not our focus, rather we look to whether trial counsel's strategic decision at the time it occurred was reasonable given the circumstances. *See Tucker v. State*, 468 S.W.3d 468, 474 (Mo. App. E.D. 2015) ("[T]he reasonableness of counsel's strategic decision-making must be viewed as of the time the decision occurred, taking into consideration the circumstances of the case."). Walker asserts trial counsel's failure to engage in cross-examination was motivated by a mistaken understanding of the law, so his strategic decision is unreasonable. *See Hinton v. Alabama*, 571 U.S. 263, 274 (2014) ("An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*."). However, trial counsel's alleged misunderstanding of

---

[6] The motion court also found that Walker's proposed cross-examination of Director had essentially already been covered through a doctor's testimony as the doctor testified that there is no "medical procedure or exam or technique that can be used to confirm or deny whether someone had suffered sexual abuse . . . . There's nothing that we could do that would specifically confirm or deny sexual abuse had occurred." We agree with Walker that the proposed cross-examination of Director would not have been cumulative to doctor's testimony at trial because each testimony covered a different issue. *See Shallow v. Follwell*, 554 S.W.3d 878, 883 (Mo. banc 2018) ("Evidence is said to be cumulative when it relates to a matter so fully and properly proved by other testimony as to take it out of the area of serious dispute.") (internal quotation omitted). Doctor's testimony was about whether there was a medical procedure or exam that could confirm if someone had been sexually abused, whereas the proposed cross-examination of Director was about whether a child's disclosure and how it was done was indicative of sexual abuse. *See Eye v. State*, 551 S.W.3d 671, 675 (Mo. App. E.D. 2018) ("[E]vidence of a different kind or of different circumstances tending to establish or disprove the same fact is not cumulative [.]").

11

the law does not touch upon a fundamental aspect of Walker's case, unlike the cases he relies on, so we cannot automatically assert trial counsel's performance was unreasonable. *Cf. Hinton*, 571 U.S. at 274 (finding deficient performance where attorney failed to request additional funding for an adequate expert because he mistakenly believed he received all available funds despite never investigating the issue); *Williams v. Taylor*, 529 U.S. 362, 395 (2000) (finding deficient performance where attorney failed to conduct an investigation that would have uncovered extensive records about defendant's childhood, which would have been helpful to the jury during sentencing, based on attorney's mistaken belief that state law barred access to those records); *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986) (finding deficient performance where attorney failed to request discovery due to mistaken belief that the State was obliged to turn over all its inculpatory evidence and that the victim's preference would determine whether the State proceeded to trial after an indictment was returned).

We find trial counsel's performance was not deficient and was reasonable trial strategy. Trial counsel sought to keep out all evidence relating to CSAAS and its components because he thought the information was irrelevant. Trial counsel argued to the trial court that this evidence "was not the kind of reliable scientific information that a jury should be able to hear." The trial court, however, allowed testimony on CSAAS's components to be received into evidence. Because of trial counsel's continued desire to keep out information about CSAAS and his fear of "open[ing] the door," trial counsel decided not to specifically ask Director about whether the components she testified to were diagnostic of sexual abuse. It is evident by trial counsel's cross-examination of

12

Director that he tried to elicit testimony that a child making a disclosure or the way in which they disclose, in and of itself, does not prove sexual abuse occurred. While there may have been another way for trial counsel to accomplish this, "[i]t is not ineffective assistance of counsel to pursue one reasonable trial strategy to the exclusion of another reasonable trial strategy." *See Hosier v. State*, 593 S.W.3d 75, 81 (Mo. banc 2019).

Walker further asserts trial counsel's trial strategy was unreasonable because Director's testimony, left unclarified, "vouched for the 'credibility and truthfulness' of [B.W.]'s and [N.G.]'s allegations by 'investing scientific cachet on the key issue of credibility." We disagree. Director's testimony was general in nature and neither referred to the victims nor indicated she spoke with the children and was testifying as to their behaviors. While her testimony touched on some aspects of phases of disclosure associated with CSAAS that were present in the case, such as children denying sexual abuse and delaying in reporting sexual abuse, Director's testimony did not vouch for the credibility and truthfulness of B.W. or N.G. *See State v. Collins*, 163 S.W.3d 614, 620-21 (Mo. App. S.D. 2005) (holding testimony about victim exhibiting behavior consistent with CSAAS and victim's behavior being "extremely typical" among sexual abuse victims did not directly or implicitly vouch for victim's credibility). Walker has failed to overcome the presumption that his trial counsel's decision not to cross-examine Director further was not a reasonable trial strategy. *See Kelley v. State*, 675 S.W.3d 583, 597 (Mo. App. W.D. 2023). Because we find trial counsel's conduct in representing Walker was not deficient, we need not address whether Walker was prejudiced by trial counsel's conduct. *See Taylor v. State*, 382 S.W.3d 78, 81 (Mo. banc 2012) ("The court may not

13

need to address both [*Strickland*] prongs if the movant has failed to make a sufficient showing on one.").[7]

Point I denied.

**Point II: Evidence on Walker's Genital Herpes**

**Analysis**

On Walker's second point on appeal, he argues the motion court clearly erred in denying his amended motion because trial counsel was ineffective in failing to investigate and present evidence related to Walker having genital herpes because even though Walker denied having any STDs, trial counsel still had a duty to investigate. We disagree.

To prevail on a claim of ineffective assistance of counsel for failure to investigate, a movant must allege: 1) what information trial counsel failed to discover; 2) that a reasonable investigation would have resulted in the discovery of such information; and, 3) the information would have aided and improved the defense. *See Prince v. State*, 390 S.W.3d 225, 233 (Mo. App. W.D. 2013). "What investigation decisions are reasonable depends 'critically' on what information that the defendant has supplied his lawyer." *Ervin v. State*, 80 S.W.3d 817, 824 (Mo. banc 2002). "And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even

---

[7] Our review of the evidence also leads us to the conclusion that Walker was not prejudiced by counsel's failure to cross-examine Director on these issues. Director's testimony at trial was very brief and was limited to general principles regarding the disclosure of child sexual abuse.

14

harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 691 (1984)). "We assess reasonableness under all the circumstances, applying a heavy measure of deference to counsel's judgments." *Hendricks v. State*, 663 S.W.3d 875, 881 (Mo. App. E.D. 2023) (internal citation and quotation omitted).

Walker has failed to demonstrate he received ineffective assistance of counsel due to trial counsel's alleged failure in investigating and presenting evidence of Walker's herpes. At the evidentiary hearing, trial counsel testified Walker was asked at least three separate times by trial counsel and his investigator, about whether Walker had any STDs. Each time, Walker denied having any STDs. Walker, however, testified at the hearing that trial counsel and the investigator knew he had genital herpes. We defer to the motion court's credibility determinations in finding trial counsel's testimony to be credible and Walker's testimony to be not credible. *See Davis v. State*, 486 S.W.3d 898, 905 (Mo. banc 2016).

Although Walker denied having any STDs to trial counsel, Walker asserts trial counsel still had a duty to investigate due to the facts of the case—the child victims alleged years of sexual abuse with no condom used, and medical tests indicated neither victim had any STDs—and no reasonable strategy could justify trial counsel's failure to do so. Here, Walker failed to inform trial counsel of his alleged herpes "outbreak" during the allegation periods and affirmatively denied having any STDs on at least three occasions. Trial counsel had no reason to doubt Walker's veracity regarding having STDs, and it would be unreasonable for trial counsel to attempt to force his client to

15

undergo medical testing in an attempt to establish that his client had a medical condition that the client denied he suffered from. Because of Walker's denials and the fact there was no medical evidence to show the child victims had any STDs, trial counsel's investigation into whether Walker had any STDs was complete. Trial counsel's decision to not further investigate was reasonable because Walker gave trial counsel reason to believe that investigating further would be fruitless due to Walker's consistent denials of having any STDs. *See Ervin*, 80 S.W.3d at 824. We need not address whether Walker was prejudiced by trial counsel's performance because Walker failed to make a sufficient showing on the performance prong. *See Taylor*, 382 S.W.3d at 81.

Point II denied.

## Conclusion

We affirm the judgment of the motion court.

_____
Gary D. Witt, Presiding Judge

All concur

16